[ORAL ARGUMENT NOT SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES POSTAL SERVICE,

Petitioner,

v.

POSTAL REGULATORY COMMISSION,

Respondent.

No. 16-1067

## RESPONDENT'S MOTION TO DISMISS

Petitioner United States Postal Service seeks review of an order of the Postal Regulatory Commission. The Postal Service files this petition under 39 U.S.C. § 3663, which provides for review of "final order[s] or decision[s]" of the Commission in accordance with the Administrative Procedure Act. Separately, however, the Postal Service also moved for reconsideration of the Commission's decision, and that motion is currently under review by the Commission.

The petition for review should be dismissed. "It is well-established that a party may not simultaneously seek both agency reconsideration and judicial review of an agency's order." *City of New Orleans v. U.S. Sec. Exch. Comm'n*, 137 F.3d 638, 639 (D.C. Cir. 1998) (per curiam). As the Court has explained, "[o]ngoing agency review renders an agency order non-final and judicial review premature." *Marcum v. Salazar*, 694 F.3d

123, 128 (D.C. Cir. 2012). Indeed, because the Postal Service's motion for
reconsideration remains pending, the Commission's decisions are not yet "final"
within the meaning of 39 U.S.C. § 3663. Accordingly, the petition should be
dismissed for lack of jurisdiction.

## STATEMENT

### A. Statutory and Regulatory Background.

One of the aims of the Postal Accountability and Enhancement Act, Pub. L.
No. 109-435, 120 Stat. 3198 (2006), was to alleviate concerns that the Postal Service
would improperly leverage its monopoly powers to set rates for products for which it
had a natural monopoly. *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 744
(D.C. Cir. 2015). The Act subjected these "market-dominant products" to a price
cap, forbidding "changes in rates" to rise faster than inflation. *Id.*

The Postal Regulatory Commission is responsible for enforcing this annual cap.
39 U.S.C. § 3622(a), (d)(1). The price cap applies to each "class of mail" for which the
Postal Service has a natural monopoly. *Id.* §§ 3622(d)(2)(A), 3642(b)(2). Within a
class, the Postal Service can permissibly raise rates for some products by more than
the rate of inflation, so long as the rate increase for the class as a whole does not
exceed the rate of inflation.

Whenever the Postal Service wants to make an inflationary rate increase, it
must inform the Commission, provide public notice, and submit supporting materials.
39 C.F.R. §§ 3010.10, 3010.12. Interested parties are given an opportunity to

2

comment, and the Commission determines whether the increase is consistent with governing law. *Id.* § 3010.11. A person who is aggrieved by the Commission's decision may seek judicial review under 39 U.S.C. § 3663.

**B. Facts and Prior Proceedings.**

For several years, certain kinds of mail were governed by three different rates: a "full-service" barcoding automation rate, a "basic" barcoding automation rate, and a non-automation rate. In 2013, the Postal Service announced that it would eliminate the basic barcoding automation rate. Thereafter, mailers that continued to use only basic barcoding would pay the higher rate for non-automated mail. The Postal Regulatory Commission concluded that the Postal Service's proposal would result in a "change in rates" within the meaning of 39 U.S.C. § 3622(d)(1)(A) and that the Postal Service's actions were therefore subject to a statutory cap that limits rate increases to the rate of inflation.

The Postal Service petitioned for review in this Court, asserting that the Commission lacked authority to regulate mail preparation changes under the price-cap power and that the Commission's determination that the barcode change had price-cap implications was arbitrary and capricious. The Court held that Postal Regulatory Commission has authority to regulate mail preparation requirements as rate changes. *U.S. Postal Serv.*, 785 F.3d at 751-52. The Court held, however, that the Commission "fail[ed] to articulate a comprehensible standard for the circumstances in which a change to mail preparation requirements . . . will be considered a 'change in rates.'"

*Id.* at 753. The Court remanded the case for the Commission to set out a standard and apply the standard to the changes at issue in this case. *Id.* at 756.

On remand, the Commission proposed a standard and requested comments. PRC Order No. 3047, at 11-12. The commenters, including the Postal Service, each proposed their own standards.

After considering the comments received, including comments from the Postal Service, the Commission determined that a mail preparation change has "rate effects under the price cap rules where it results in the deletion or redefinition of a rate cell." PRC Order No. 3047, at 20. The Commission explained that the deletion of a rate cell included the "functional equivalent" of deletion, where a rate remains on the schedule but mailers cannot actually use the rate. The Commission concluded that a mail preparation change redefines a rate cell where it requires a "significant change" to "'what the mailer sends'" or "'how the mailer sends it.'" *Id.* at 15-16. Applying this test to the barcoding change, the Commission held that it was the functional equivalent of a cell deletion because mail could no longer be sent using the basic barcoding rate. *Id.* at 22.

On February 22, the Postal Service filed this petition for review. *See* Ex. A (Petition for Review). The Postal Service invokes 39 U.S.C. § 3663, which allows for appellate review of "final order[s] or decision[s]" of the Postal Regulatory Commission "in accordance with section 706 of title 5." 39 U.S.C. § 3663.

The same day that it filed the petition for review, the Postal Service filed a motion for reconsideration before the Commission. Ex. A at 1 (motion for reconsideration). The Commission accepted the motion for reconsideration and set a briefing schedule. Ex. B at 1-2 (order).

## ARGUMENT

### The Pending Motion For Reconsideration Renders The Petition For Review Incurably Premature.

As this Court has made clear, "'a party may not simultaneously seek both agency reconsideration and judicial review of an agency's order,'" but instead "must choose between administrative relief and judicial relief." *City of New Orleans v. U.S. S.E.C.*, 137 F.3d 638, 639 (D.C. Cir. 1998) (per curiam) (quoting *Tennessee Gas Pipeline Co. v. FERC*, 9 F.3d 980, 980 (D.C. Cir. 1993) (per curiam)). Here, the Postal Service has simultaneously filed both a motion for reconsideration and a petition for review.

The pendency of the Postal Service's motion for reconsideration presents a jurisdictional bar to this Court's review. The relevant statute, 39 U.S.C. § 3663, authorizes review in this Court only as to a "*final* order or decision of the Postal Regulatory Commission." 39 U.S.C. § 3663 (emphasis added). "Ongoing agency review renders an order nonfinal for purposes of judicial review, and a petition for review of the order is incurably premature." *International Telecard Ass'n v. F.C.C.*, 166 F.3d 387, 388 (D.C. Cir. 1999) (per curiam); *accord Center for Art & Mindfulness v. Postal Regulatory Comm'n*, Order, No. 15-1079 (Jan. 4, 2016), *reh'g en banc denied* (Mar. 3, 2016)

(dismissing petition because reconsideration motion was filed with the Commission). This result obtains regardless of the precise scope of relief sought by the Postal Service in its reconsideration motion. *See, e.g.*, *Bellsouth Corp. v. F.C.C.*, 17 F.3d 1487, 1489-90 (D.C. Cir. 1994) ("[O]nce a party petitions the agency for reconsideration of an order *or any part thereof*, the *entire* order is rendered nonfinal as to that party.") (emphasis added).

Once the Commission disposes of the Postal Service's motion for reconsideration, any person aggrieved by that disposition may seek judicial review. In the meantime, "it is a pointless waste of judicial energy for the court to process any petition for review before the agency has acted on the request for reconsideration." *TeleSTAR, Inc. v. F.C.C.*, 888 F.2d 132, 134 (D.C. Cir. 1989) (per curiam). Accordingly, the petition for review should be dismissed for lack of jurisdiction. *See City of New Orleans*, 137 F.3d at 639 ("If a party pursues administrative and judicial relief concurrently, its petition for judicial review 'will be dismissed for lack of jurisdiction.'") (quoting *Wade v. F.C.C.*, 986 F.2d 1433, 1433 (D.C. Cir. 1993) (per curiam)).

## CONCLUSION

For the foregoing reasons, the petition for review should be dismissed.

Respectfully submitted,

Of Counsel:

DAVID A. TRISSELL
  *General Counsel*

CHRISTOPHER J. LAVAR
  *Deputy General Counsel*

BENJAMIN C. MIZER
  *Principal Deputy Assistant Attorney General*

MICHAEL S. RAAB
  (202) 514-4053

  /s/ Dana Kaersvang
DANA KAERSVANG
  (202) 307-1294
    *Attorneys, Civil Division*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue, NW*
    *Room 7216*
    *Washington, DC 20530*

March 2016

Exhibit A

**Postal Regulatory Commission**
**Submitted 2/22/2016 4:08:06 PM**
**Filing ID: 95070**
**Accepted 2/22/2016**

BEFORE THE
POSTAL REGULATORY COMMISSION
WASHINGTON, D.C. 20268-0001

| | |
|---|---|
| NOTICE OF MARKET-DOMINANT PRICE ADJUSTMENT | Docket No. R2013-10R |

## MOTION FOR RECONSIDERATION OF ORDER NO. 3047

By its attorneys:

Kevin A. Calamoneri
Deputy General Counsel, Headquarters

Richard T. Cooper
Managing Counsel, Corporate & Postal
Business Law

Daniel J. Foucheaux, Jr.
Chief Counsel, Pricing & Product Support

R. Andrew German
Managing Counsel, Legal Strategy

Keith E. Weidner
Chief Counsel, Legal Policy & Legislative
Advice

David C. Belt
Jacob D. Howley
David H. Rubin
Ashley S. Silberhorn

475 L'Enfant Plaza West, S.W.
Washington, D.C. 20260-1135
(202) 268-8917
February 22, 2016

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................. 1

II.     ORDER NO. 3047 MISINTERPRETS THE HOLDING OF THE COURT OF
        APPEALS .......................................................................................... 3

   A.   The Commission's New Test Appears to Be Essentially the Same as the Test that
        the Court Already Rejected. ................................................................ 4

   B.   The Commission's Rationale for Rejecting the Postal Service's Proposals, That It
        Has a Statutory "Duty" to Enforce the Price Cap, Is Based on a Misreading of the
        Court's Holding and is Erroneous. ...................................................... 7

III.    ORDER NO. 3047'S STANDARD IS ALSO INCONSISTENT WITH THE
        COURT'S DECISION BECAUSE IT WOULD REGULATE MAILERS' COSTS,
        NOT THE PRICES THAT MAILERS PAY .......................................... 10

IV.     ORDER NO. 3047 FAILS TO EXPLAIN HOW THE COMMISSION'S CHOSEN
        APPROACH ACCORDS WITH STATUTORY CRITERIA OR RESPONDS TO
        SIGNIFICANT COMMENTS ABOUT STATUTORY COMPLIANCE ................... 16

   A.   The Commission Is Legally Bound to Address Statutory Criteria. ..................... 17

   B.   The Commission Is Legally Bound to Respond Meaningfully to All Significant
        Comments. ...................................................................................... 20

   C.   The Commission Failed to Meaningfully Explain How Its Final Rule Addresses the
        Statutory Criteria, Particularly in Light of the Postal Service's Comments.......... 22

   D.   The Commission Failed to Address Significant Comments About Its Promise to
        Establish an Intelligible Standard That Can Be Applied to the Elimination of
        Return Receipt for Merchandise Service. ............................................... 31

V.      THE COMMISSION'S STANDARD FAILS TO PROVIDE CLEAR GUIDANCE
        AND POSES PRACTICAL PROBLEMS THAT ORDER NO. 3047 DOES NOT
        RESOLVE ........................................................................................ 33

   A.   The Postal Service and Other Parties Cannot Assess Significance in a Meaningful
        Way, in Light of the Lack of Insight Into Mailer Costs. ........................... 33

   B.   Order No. 3047's "Significance" Requirement is an Amorphous  Standard That
        Fails to Provide Clarity or Meaningful Guidance.................................... 43

   C.   The First Prong of the Commission's Test Only Increases the Confusion
        Concerning Which Mail Preparation Changes Would Be Deemed "Changes in
        Rates."............................................................................................ 49

   D.   The Commission Improperly Assumes That No Mailers Will Adapt.................... 54

VI.     CONCLUSION ................................................................................. 62

## I.    INTRODUCTION

On January 22, 2016, the Commission issued Order No. 3047, setting forth the standard it plans to use in determining when changes in mail preparation requirements implicate the price cap.  This Order was in response to the court's May 2015 remand in *United States Postal Service v. Postal Regulatory Commission*, which held that while the Commission is "not entirely foreclose[d] . . . from determining that some mail preparation requirements constitute 'changes in rates,'" it had failed to articulate an "intelligible standard" for making that determination in Order No. 1890.[1]  The Postal Service hereby moves for reconsideration of Order No. 3047, and – if the Commission insists on retaining its current approach – greater clarification as to how it will apply its standard going forward.

Reconsideration is necessary because the Commission has not adequately responded to the court's remand, for the reasons discussed below.  The approach set forth by the Commission lacks clarity and appears no different from the prior standard that the court rejected as "not com[ing] close to satisfying the requirement of reasoned decisionmaking."[2]  Given the court's finding that the statute is ambiguous, the Commission cannot repeatedly point to a purported "statutory duty" to enforce the price cap as a basis to avoid these policy considerations.  In fact, since the Commission is now justifying its approach on the need to protect mailers from higher mail preparation costs (as opposed to higher rates), the Commission needs to explain how that approach accords with the court's interpretation of the phrase "changes in rates" as meaning

---

[1] 785 F.3d 740, 756 (D.C. Cir. 2015).

[2] *Id.* at 754.

changes to the prices that mailers pay to the Postal Service, rather than the separate and distinct preparation costs they incur. If the Commission nevertheless maintains that its approach does square with the statutory language, then it must also explain how dramatically expanding the application of the price cap to serve such a purpose achieves the statutory objectives and accounts for the statutory factors. In this regard, it is not apparent what statutory objective is actually advanced by an approach that seeks to penalize the Postal Service for implementing operational requirements that enhance efficiency or serve other important purposes by requiring the Postal Service to forego a disproportionate amount of its scant price cap authority. Order No. 3047 fails to offer any glimpse into the Commission's reasoning on these central points.

Furthermore, the Commission needs to provide much greater clarity regarding the application of its standards. For instance, the application of the deletion prong (which lacks a significance requirement) as compared to the redefinition prong (which has a significance requirement) seems inherently arbitrary, considering that both apply to ultimately indistinguishable circumstances in which the end choice faced by a mailer is the same (whether to make a mail preparation change in order to continue to qualify for particular rates). In addition, regarding the "significance" standard set forth in the second prong, the Commission needs to provide clearer guidance as to how the standard will be applied, in terms of the type of mail preparation changes that will be deemed "significant" and how the Commission will objectively make such a determination given its reliance on a criterion – mailer costs – that will often be unverifiable. Greater clarity as to these issues is critical so that the Postal Service can make business decisions over the next several years, during the pendency of both any

potential further judicial review in this proceeding and the Commission's fundamental re-examination of the price cap system under 39 U.S.C. § 3622(d)(3).

Finally, reconsideration is necessary in light of the adverse financial consequences that Order No. 3047 would impose on the Postal Service. Either the Postal Service must forgo regulations that would improve operational efficiency and service performance measurement, or it must lose substantial revenue by assuming that no mailers will respond to a new mail preparation requirement. As discussed in section V.D below, if the Postal Service had gone forward with the Full-Service Intelligent Mail barcode (IMb) requirement, Order No. 3047 would have cost it $373 million to $1.223 billion in annual revenue. Given the Postal Service's financial troubles and their relevance to the statutory objectives, the Commission should reconsider its decision.

## II.    ORDER NO. 3047 MISINTERPRETS THE HOLDING OF THE COURT OF APPEALS

The U.S. Court of Appeals for the District of Columbia Circuit's decision stands for two basic propositions. First, although the phrase "changes in rates" in 39 U.S.C. § 3622(d)(1)(A) is sufficiently ambiguous that it <u>could</u> be read expansively to encompass <u>some</u> changes to mail preparation requirements with so-called "rate effects," it cannot encompass all such changes. Rather, if the Commission chooses to interpret the phrase as meaning something beyond literal changes in rates, it must articulate a "comprehensible" standard that provides both clear limits on the types of mail preparation changes that are subject to the cap and meaningful guidance about which mail preparation changes would be covered. Second, the test articulated in Order No. 1890 did not set forth a comprehensible standard, so the Commission must

- 4 -

devise a different standard.  As explained below, Order No. 3047 runs afoul of both propositions.  Therefore, it is inconsistent with the court's decision and should be reconsidered to provide interested parties a clear standard and meaningful guidance concerning how and when it will be applied.

### A.    The Commission's New Test Appears to Be Essentially the Same as the Test that the Court Already Rejected.

Every mail preparation requirement is, by definition, a requirement: if a mailpiece does not meet it, the mailpiece does not qualify for the rate in question.  In that sense, any new requirement and any change to an existing requirement could have a so-called "rate effect": a mailer that does not change its practices to comport with the new or altered requirement will generally find its mailpieces relegated to a higher rate cell.  The court held that the plain language of the phrase "changes in rates" does not "entirely foreclose" interpreting the price cap as giving the Commission "some authority to assess mail preparation requirements that have rate effects" and to "determin[e] that some [new] mail preparation requirements 'changes in rates.'"[3]

However, the court made clear that the Commission cannot treat all changes to mail preparation requirements as "changes in rates."  To ensure that the Commission does not "indiscriminately treat all new mail preparation requirements as rate adjustments,"[4] the court added, it must set forth a "comprehensible" standard that provides both clear limits on the range of mail preparation changes that will be deemed

---

[3] *Id.* at 753, 756 (emphasis added).

[4] *Id.* at 754 (quoting Order No. 1890, Order on Price Adjustments for Market Dominant Products and Related Mail Classification Changes, PRC Docket No. R2013-10 (Nov. 21, 2013), at 25).

"changes in rates"[5] and "meaningful guidance to the Postal Service [and] its customers on how to treat future changes to mail preparation requirements."[6]

Applying those principles, the court rejected the Commission's test in Order No. 1890. Under that test, a mail preparation change implicates the price cap if it changes a "basic characteristic of a mailing," in the sense that it compels mailers "to change their mailing practices in order to qualify for the same rates they currently qualify for."[7] The court concluded that the Commission's test "did not come close" to surviving judicial review because it was "cryptic, to say the least," "has no content," "is indiscriminate and offers no meaningful guidance."[8] The court was also unpersuaded by the Commission's attempt to give its test content by emphasizing that only "significant" changes would satisfy the "basic characteristic of a mailing" test; the court expressed confusion over "why the magnitude of the change determines whether the change affects 'a basic characteristic of a mailing,'" let alone dictates whether it is a change to rates.[9] The court accordingly remanded the case so that the Commission would "enunciate an intelligible standard" governing which mail preparation requirements would be deemed changes in rates "and then reconsider its decision in light of that standard."[10]

On remand, the Commission appears to have done nothing more than make cosmetic adjustments to the test that the court already rejected. Under the test that the

---

[5] *Id.* at 744 (holding that a "boundless" standard is "unreasonable").

[6] *Id.* at 754; *accord id.* at 755 (standard must "resolve[ ] the ambiguity about the treatment under the price cap of future mail preparation requirement changes" and "provide[ ] guidance for future cases").

[7] *Id.* at 754.

[8] *Id.*

[9] *Id.* at 755.

[10] *Id.* at 756.

- 6 -

court rejected, "significant" changes to mail preparation requirements were "changes in rates" because they altered "basic characteristics of a mailing," whereas "minor" changes did not.[11]  Under the new test, <u>all</u> mail preparation requirement changes affect the basic characteristics of a mailing – which the Commission defines as everything reflecting "what the mailer sends" and "how the mailer sends it"[12] – and such changes implicate the price cap when they amount to a "significant change" or are "large in magnitude," but not when they are "minor" or "routine."[13]  Nowhere in Order No. 3047 does the Commission explain how this test differs substantively from its previous test, and any such differences are not readily apparent.

Even if the new test is somehow intended to differ from the earlier test that the court rejected, it fails to respond to the court's instruction that the standard must provide clear guidance to the Postal Service on how to treat future cases.  Indeed, Order No. 3047 suggests that, despite the court's instruction, there is no way to provide such guidance – in the Commission's words, whether a change is significant "cannot be pre-determined with absolute precision" – even as it assures the Postal Service that the Commission is in a "unique position" to assess the significance of a change based on "a case-by-case analysis of the individual mail preparation changes."[14]  This essentially is

---

[11] Order No. 1890 at 29, 72.

[12] Order No. 3047, Order Resolving Issues on Remand, PRC Docket No. R2013-10R (Jan. 22, 2016), at 16.

[13] *Id.* at 16-17; *accord id.* at 2 (mail preparation changes are subject to the cap when they cause "a significant change to a basic characteristic of the mailing"); *id.* at 13 (mail preparation changes implicate the price cap when they are "significant enough"); *id.* at 17 (a rate cell has been "redefined" by a mail preparation change when "the basic characteristics of the mailing" are "significantly different"); *id.* at 19 ("a 'significance' factor is essential to the analysis of whether a rate cell has been redefined because it directly measures the amount of change that can occur to a rate cell before it can be considered 'redefined'").

[14] *Id.* at 19.

nothing more than an "I know it when I see it" standard, which the D.C. Circuit has warned is an inadequate approach for a regulatory agency to take.[15]  As such, it must be reconsidered because it is too arbitrary as a standard.

**B.    The Commission's Rationale for Rejecting the Postal Service's Proposals, That It Has a Statutory "Duty" to Enforce the Price Cap, Is Based on a Misreading of the Court's Holding and is Erroneous.**

The Commission's suggestion that it cannot articulate a standard containing both clear limits and meaningful guidance is particularly perplexing, given that the Commission does not dispute that both of the Postal Service's proposals satisfy those requirements.  Under the first Postal Service proposal, the phrase "changes in rates" would be read to refer to literal changes in the posted rates charged for a given product, and non-rate changes that could force mailers into different rate categories would be assessed through other regulatory tools, such as the complaint process or the Commission's rules concerning classification changes.  Under the second proposal, "changes in rates" could be read to cover mail preparation changes that alter size, weight, or minimum volume thresholds: that is, "mail characteristics" that the Commission deems "basic" enough to be included in the definition of products in the Mail Classification Schedule (MCS).  The Commission rejected both proposals because they supposedly would require the Commission to "abdicate" or "relinquish" its "statutory duty" to evaluate changes to mail preparation requirements under the price cap or

---

[15] *See, e.g.*, *NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008) (when agency discretion is not restrained by more than a "we-know-it-when-we-see-it" standard, "the danger of arbitrariness (or worse) is increased"); *City of Vernon, Cal. v. FERC*, 845 F.2d 1042, 1048 (D.C. Cir. 1988) (the "'know-it-when-we-see-it' approach . . . does not provide a reasoned explanation of an agency decision"); *accord, e.g., Am. Petroleum Inst. v. EPA*, 661 F.2d 340, 349 (5th Cir. 1981) (judicial review "must be based on something more than trust and faith in [the agency's] experience," and courts require agencies to "articulate the criteria employed in reaching their result and are no longer content with mere administrative *ipse dixits* based on supposed administrative expertise" (citation omitted)).

otherwise to enforce the cap,[16] and thus would be "inconsistent with Commission precedent, the Court's remand, and the price cap statute."[17]  The Commission also justifies its approach as "balancing" the needs of the Postal Service "with the statutorily mandated price cap it is required to enforce."[18]  However, the only Commission precedent on which Order No. 3047 relies is Order No. 1890, which the court remanded, and nothing in either the court's opinion or the statutory text suggests that the Commission has a "duty" to evaluate mail preparation requirements under the price cap.

    To the contrary, the court held that the plain language of the phrase "changes in rates" is <u>ambiguous,</u> and allows for a range of permissible interpretations, including the interpretation that the Postal Service advanced in the earlier proceeding.  Accordingly, the Commission is free to interpret that language strictly to refer to literal changes to the rates that the Postal Service charges for its services, or more expansively to encompass some non-rate changes that shift mailpieces into higher rate cells and thereby cause mailers to pay higher rates to the Postal Service.  There is no "statutory duty" to interpret the statute expansively, and the Commission's contrary assertion would not survive judicial review.  As the D.C. Circuit has held, "when 'an agency erroneously contends that Congress'[s] intent has been clearly expressed and has rested on that ground, we remand to require the agency to consider the question afresh

---

[16] Order No. 3047 at 37, 39.

[17] *Id.* at 36.

[18] *Id.* at 20.

- 9 -

in light of the ambiguity we see.'"[19]  The Commission's duty on remand is to evaluate

the alternatives and justify the approach that makes the most sense in order to achieve

the statutory objectives and account for the statutory factors.[20]

The Commission cannot defend its interpretative choice – and evade a

meaningful evaluation of the policy issues that are implicated by that choice – on the

ground that that choice was somehow compelled by the statutory language or the

court's decision.  Even if the Commission could have reached the same result in an

exercise of discretion, the Commission must, in fact, exercise that discretion by

choosing one interpretation over other permissible alternatives and then explaining why

the chosen approach best fulfills the purpose of the statute.  Order No. 3047 does not

do that.[21]

Similarly off the mark is the Commission's statement that the court "upheld" the

"Commission's approach to reviewing mail preparation requirement changes."[22]  To the

contrary, the court noted merely that the Commission is not "entirely foreclose[d] . . .

from determining that some mail preparation requirements constitute 'changes in

---

[19] *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 209 (D.C. Cir. 2011) (quoting *Cajun Elec. Power Coop., Inc. v. FERC*, 924 F.2d 1132, 1136 (D.C. Cir. 1991)).

[20] The statute states that the regulatory system under Section 3622 "shall be designed to achieve" the objectives, and "shall take into account" the factors.  While the mandatory requirements of Section 3622(d)(1)-(2) take precedence over the objectives and factors to the extent of any inconsistency (at least until the ten-year review under Section 3622(d)(3)), those objectives and factors clearly must guide the Commission as it chooses how to fill interpretive gaps where the language of Section 3622(d)(1)-(2) is ambiguous.

[21] For instance, in rejecting the Postal Service's proposal that the Commission use other regulatory mechanisms to evaluate mail preparation changes, the Commission asserts that the proposal is unacceptable because those mechanisms would not "regulate the price cap sufficiently" and thus would "contravene the price cap statute."  Order No. 3047 at 38.  The Commission's logic is circular, however; the whole point of the Postal Service's proposal is that mail preparation changes are better regulated through means other than the price cap.  Furthermore, the notion that the Postal Service's proposal would enable it to "avoid regulatory compliance," *id.*, is simply untrue, unless it is the Commission's view that the price cap provides the only regulatory tool available to it under the statute.

[22] *Id.* at 36.

rates.'"[23]  In fact, it remanded the case because the Commission's approach did not

"enunciate an intelligible standard" and because its approach seemed "boundless and,

thus, unreasonable."[24]  Moreover, as discussed in section III below, Order No. 3047's

justification of the Commission's approach – emphasizing the desire to protect mailers

from increased mail preparation costs – serves to demonstrate that that approach is

wholly divorced from the court's explanation for why the statute could be interpreted as

extending beyond literal changes in rates in the first place.

In any event, the Commission cannot claim that its hands are tied by a statutory

or court-imposed duty to interpret the statute as Order No. 3047 does.  The Commission

is making an affirmative choice of how to interpret the statute, and so it must evaluate

and explain why, as a matter of policy, its choice makes more sense than the alternative

proposals that the Postal Service has advanced.

### III.    ORDER NO. 3047'S STANDARD IS ALSO INCONSISTENT WITH THE COURT'S DECISION BECAUSE IT WOULD REGULATE MAILERS' COSTS, NOT THE PRICES THAT MAILERS PAY

Besides pointing to a purported "statutory duty" that somehow arises from a

statute that the court actually found to be ambiguous, Order No. 3047 is flawed because

the Commission ultimately justifies and applies its standard on the basis of a statutory

interpretation that is wholly distinct from what was accepted by the court as being

reasonable.  According to the Commission, its approach in applying the price cap to

mail preparation changes is not intended to protect mailers from increased prices, but to

protect mailers from increased costs in preparing their mailpieces.  Indeed, the fact that

---

[23] *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 756 (D.C. Cir. 2015).

[24] *Id.* at 744.

this is the real purpose behind the standard is also clearly evident from the way that it is being applied.  However, the Commission does not explain how this view of the price cap accords with the statutory language and the court's decision, much less the objectives of the law.

The Commission correctly notes that the court accepted the concept that the statutory phrase "changes in rates" could <u>potentially</u> be read as applying to mail preparation changes with "rate effects," on the basis that doing so serves the purpose of preventing the Postal Service from evading the price cap by shifting mail to more expensive rates through manipulation of its mail preparation rules.  But simply repeating the court's statutory holding does not serve to justify the Commission's chosen standard.  As the court found, while the Commission may have "some authority to assess mail preparation requirements that have rate effects," the Commission must set forth a reasonable, and reasonably explained, standard for effectuating that authority. Among other things, this requires the Commission to explain why the standard it has chosen actually advances the interpretation accepted by the court: that is, to articulate why the standard reasonably determines when mail preparation changes will cause "changes in the rates paid by mailers," and hence will have "rate effects."[25]

The Commission, however, makes no attempt to explain why the magnitude of a mail preparation change is the proper basis for determining whether mailers will shift to paying higher rates.  This is telling because, as noted above, the standard the Commission has chosen is essentially the same as the prior standard, which the court not only rejected as being not "close to reasoned decisionmaking," but specifically found

---

[25] *Id.* at 752.

to be predicated on a basis – the magnitude of the mail preparation changes – that was an "unclear" means for distinguishing between mail preparation changes that have rate effects, and those that did not.  Specifically, the court noted that

> it is unclear from the Commission's decision why the size of the change determines the "type" of the change – i.e., why a small change that admittedly affects rates is not a "change in rates." It is likewise unclear why the magnitude of the change determines whether the change affects "a basic characteristic of a mailing."[26]

Despite the court's specific uncertainty about this rationale, the Commission sheds no light on its current rationale for why significant changes should implicate the cap, if its purpose is to ensure that the Postal Service does not evade the cap by using such changes to increase the rates paid by mailers.  The Commission does not, for instance, repeat the point that it made in its brief to the court that the more insignificant a mail preparation change is, the more willing mailers are to make the change, and hence the less likely that mailers would be to pay a higher price.[27]

Indeed, as the Postal Service discussed extensively in its comments, there is a fundamental problem with equating the significance of a mail preparation change with its "rate effects," as the Commission's brief attempted to do: it ignores experience and economic reality.   In particular, while it is possible that some mailers will not adapt and therefore pay a higher rate, experience shows that those who choose to stay in the mail generally adapt to even "significant" changes in order to maintain eligibility for the discounted rates, while others may leave the mail entirely (a fact which necessarily

---

[26] *Id.* at 755.

[27] Brief for the Postal Regulatory Commission at 42, *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740 (D.C. Cir. 2015) (No. 13-1308).  The Court rejected this argument, first on the basis that it was not set forth in the Commission's order, and then on substantive basis that it "cannot be squared with the Commission's rule that the Postal Service may not rely on forecasts of mailer behavior."  *U.S. Postal Serv.*, 785 F.3d at 755.

makes the Postal Service cautious in its approach to mail preparation changes).  Thus, as the Postal Service pointed out, it is simply not accurate to believe that mailers are particularly unwilling to adapt to significant mail preparation changes, therefore choosing to pay higher rates instead.  The Commission does not dispute this point in Order No. 3047.

Rather, the Commission has now determined that it should simply drop the notion that its approach has anything at all to do with protecting mailers from paying higher prices.  The Commission now justifies its standard on the grounds that the cap must be employed to protect mailers from higher mail preparation <u>costs</u>.  First, in its conclusory discussion of how its approach accords with the objectives of the law, the Commission states that its intent is to use the price cap to "protect mailers from operational changes <u>that impose significant costs and operational adjustments</u>."[28] Later, in its discussion as to why the Postal Service's proposals are unacceptable, the Commission repeated this point, noting that accepting those proposals would "allow the Postal Service to increase the prices paid by mailers irrespective of the price cap <u>by shifting the burden and costs of mail preparation changes to mailers</u>."[29]  This shift in focus is demonstrated by how the Commission applies the test itself: the focus of the test is entirely on the operational adjustments and/or costs that mailers must incur.[30]

---

[28] Order No. 3047 at 19 (emphasis added).

[29] *Id.* at 39 (emphasis added).

[30] While consideration of the operational adjustments and/or costs required of mailers is the sole focus of whether a mail preparation change implicates the cap, the actual calculation of the change's cap impact is based on a calculation of the increased revenue that the Postal Service would (theoretically) generate if no mailer actually decided to adjust to the mail preparation change and all mailers therefore paid the higher rate.  However, the theoretical revenue that would be earned by the Postal Service if no mailers adjusted to the change is not a rational proxy for the costs of the operational adjustment: mailers adjust to mail preparation changes based on the determination that making the change is <u>less</u> burdensome than

However, the Commission fails to recognize that, by equating "rates" mailers pay with the costs they incur in preparing their mailings, it is setting forth a conception of the meaning of the phrase "changes in rates" that is wholly inconsistent with the court's statutory holding.  The court held that

> [t]he critical statutory question in this case is whether "changes in rates" encompasses only changes to the official posted prices of each product, as the Postal Service argues, or also changes to the prices actually applied to particular mailpieces, as the Commission argues.  The language of the Act is ambiguous: "Changes in rates" is not specifically defined, and <u>could apply either to the posted rates or the rates that customers actually pay.</u>  Neither interpretation conflicts with the statutory definition of "rates" as "fees for postal services," since fees, like rates, can be both posted on a list and charged to specific mailpieces.  *See id.* § 3622(d)(1)(A).  The language of the statute therefore does not conflict with an interpretation of "changes in rates" as changes in the fees as applied to specific classifications of mailpieces.[31]

Therefore, the court found that the statutory phrase "changes in rates" could be read not simply to encompass changes to the rate levels themselves, but also to some changes that result in mailers paying a different rate: that is, the cap could be read to apply to some mail preparation changes that "cause changes in the rates experienced by mailers" (i.e., changes that have "rate effects" because they result in "changes in rates paid by mailers").[32]  The court certainly did <u>not</u> hold that the statutory language could also be read to apply to mail preparation changes that result in changes to the costs that mailers incur in order to prepare their mailings to meet new postal specifications,

---

paying the higher rate.  This means that there is no rational relationship between the supposed purpose of the cap – protecting mailers from the burdens imposed by operational adjustments – and the actual calculation of price cap impact.

[31] *U.S. Postal Serv.*, 785 F.3d at 751 (emphasis added).

[32] *Id.* at 751-52.

separate and distinct from the rates that they pay to the Postal Service.[33]  Indeed, as
the Supreme Court recently held, the meaning of "rates" in regulatory statutes is
"uniformly" "the amount of money a consumer will <u>hand over</u> in exchange for" the
product sold by the regulated entity: "[i]t is the price paid, not the price paid plus the cost
of a forgone economic opportunity."[34]

The Commission did not even argue to the court that changes to mailer costs
implicate the price cap.  Rather, after noting that the Intelligent Mail barcode (IMb)
requirement change meant that mailers either had to change how they prepared their
mail, or not change their mail and therefore pay the higher non-automation rate, the
Commission maintained that only the latter group of mailers – those who do not incur
the costs of the mail preparation change – would experience a "rate" change:

> Moreover, mailers who wished to avoid non-automation rates, but
> currently only employed basic barcoding, were now required to undertake
> modifications that the Postal Service itself acknowledged would be
> "significant."  78 Fed. Reg. at 23137.  <u>Any mailer that found these
> requirements too burdensome would prospectively have to pay
> substantially more for delivery of its mail. In these circumstances, common
> sense indicates that the Postal Service effectively changed its "rates," for
> at least some mailers.</u>
>        These conclusions find support in the statutory definition – which
> says that the term "rates" includes postal "fees," 39 U.S.C. § 102(7) –
> because mailers <u>unwilling to alter their practices</u> would now have to pay
> higher fees for postal services.[35]

---

[33] To use a simple hypothetical, assume that the Postal Service charged only one rate and altered its
rules to set forth a significant new mail preparation requirement to access that rate.  That new
requirement would certainly increase the costs to mailers in preparing their letters, but it would not have
"rate effects," because it would not change the rate paid by mailers.  Nevertheless, under the
Commission's interpretation, this would constitute a "change in rates."

[34] *FERC v. Elec. Power Supply Ass'n*, __ U.S. __, 136 S. Ct. 760, 777-78 (2016) (emphasis added).

[35] Brief for the Postal Regulatory Commission at 20-21, *U.S. Postal Serv.* (No. 13-1308) (emphasis
added).  The brief also reminded the court of its past pronouncement that "[a] postal rate is the fee or
price the Postal Service charges for its services."  *Id.* at 21 (citing *Governors of the U.S. Postal Serv. v.
Postal Rate Commission*, 654 F.2d 108, 114 n.6 (D.C. Cir. 1981)).

- 16 -

Similarly, the Commission brief also noted that adoption by mailers of a mail preparation change means "that no prices have really 'changed.'"[36]

Thus, the Commission has significantly changed the articulated purpose of its approach to applying the price cap to mail preparation changes. Gone is any profession that its standard has anything to do with regulating the prices that customers actually pay; rather, the Commission has now articulated that its goal is to protect mailers from having to make significant operational adjustments.[37] Having now shifted the focus from rates to mailer costs, the Commission must articulate why it has concluded that using the cap to effectively control increases in mailer costs (not just rates) is consistent with section 3622(d) and, if it concludes that that is the case, why it achieves the statutory objectives and accounts for the statutory factors.[38]

## IV.    ORDER NO. 3047 FAILS TO EXPLAIN HOW THE COMMISSION'S CHOSEN APPROACH ACCORDS WITH STATUTORY CRITERIA OR RESPONDS TO SIGNIFICANT COMMENTS ABOUT STATUTORY COMPLIANCE

In addition to meeting the court's directives, the Commission must meaningfully explain how its chosen standard fulfills the relevant statutory objectives and factors. Indeed, because the statutory price cap language is ambiguous and the Commission therefore has a choice as to how to apply the regulatory system to mail preparation changes, section 3622 requires the Commission to consider what approach best achieves the objectives, taking into account the factors. In its initial and reply

---

[36] *Id.* at 42.

[37] This focus is underscored by the test itself, which is entirely predicated on the Commission's subjective views as to the significance of the operational adjustments faced by mailers.

[38] *See LePage's 2000, Inc. v. Postal Regulatory Comm'n*, 642 F.3d 225, 233-34 (D.C. Cir. 2011) (vacating and remanding a Commission order on nonpostal services because "the Commission altered its analytic frame" from an earlier order in the same proceeding but "offered no reason for this departure").

comments, the Postal Service pointed out numerous ways in which the case-by-case, discretionary approach proposed by the Commission would fail to achieve the statutory objectives or appropriately account for the statutory factors. The Postal Service also reminded the Commission that its standard must account for how the elimination of an entire service should be treated under the price cap, if at all.

Rather than addressing those comments and explaining how its final rule resolves them, as the Administrative Procedure Act (APA) requires the Commission to do, the Commission apparently treated its nominal departure from Order No. 2586's multifactor formulation as a reason to avoid the substantive comments. The same concerns self-evidently apply to the final rule as to the proposed rule, however. The statute and case-law is clear that the Commission must do more to support its approach and to respond to the Postal Service's comments in order to avoid arbitrariness, and so Order No. 3047 must be reconsidered.

A.    The Commission Is Legally Bound to Address Statutory Criteria.

Under the APA, an agency acts arbitrarily and capriciously if it does not show that it "understood the relevant factors to be considered and . . . provide[ ] an adequate explanation of its reasoning process."[39] Where legitimate doubts might exist about whether an agency's preferred approach fulfills statutory criteria, the agency cannot simply assert that its approach does so; rather, the agency must "persuasively explain" why its approach does, in fact, fulfill the criteria and why "alternatives would be less desirable."[40] "[T]o this end, conclusory statements will not do; an 'agency's statement

---

[39] *Office of Comm'cn of United Church of Christ v. FCC*, 707 F.2d 1413, 1440 & fn.88 (D.C. Cir. 1983) (citing, *inter alia*, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

[40] *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 882 (D.C. Cir. 1999).

must be one of <u>reasoning</u>.'"[41]  It is not enough for the Commission to recite applicable statutory criteria and assert <u>that</u> they are met; the Commission must detail its reasoning as to <u>how</u> its decision meets those criteria in order to supply any reviewing court with an adequate record for review.[42]  The Commission failed to do so in Order No. 3047: to the extent that the Commission references the objectives and factors at all, its discussion of them is conclusory and perfunctory.  In addition, the Commission fails to even mention many of the objectives and factors, much less reconcile its approach with them.  The Commission should reconsider its decision to give all parties (as well as any potential reviewing court) the benefit of its reasoning.

By way of example, the U.S. Court of Appeals for the District of Columbia Circuit remanded a decision by the Federal Maritime Commission (FMC) for failure to address antitrust implications, which the governing statute expressly required the FMC to consider.  As background, Section 15 of the Shipping Act of 1916 "represents a compromise between the established national antitrust policy and the potential public benefits to be derived from allowing ocean carriers to restrict or eliminate competition among themselves" through agreements or "conference" associations that fix rates and terms of service.[43]  These arrangements are immune from general antitrust liability but subject to regulation by the FMC, which must "disapprove those agreements [that are]

---

[41] *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citations omitted, emphasis in original); *see also Sierra Club, Inc. v. Bostick*, 539 Fed. Appx. 885 (10th Cir. 2013) (unpublished) (Martinez, J., dissenting) ("[T]he law is clear that the agency cannot simply state the legal standard and then recite that it made a 'determination' that such criteria were satisfied." (citations omitted)).

[42] *See Amerijet Int'l*, 753 F.3d at 1350 ("This basic principle [that an agency must set forth its reasons for decision], codified in 5 U.S.C. § 555(e), is indispensable to sound judicial review." (citations omitted)); *Arrington v. Daniels*, 516 F.3d 1106, 1115 (9th Cir. 2008); *Radio-Television News Dirs. Ass'n*, 184 F.3d at 885.

[43] *U.S. Lines, Inc. v. FMC (Euro-Pacific)*, 584 F.2d 519, 527 (D.C. Cir. 1978).

unjustly discriminatory or unfair, detrimental to United States commerce, . . . in violation of the Shipping Act, [or 'contrary to the public interest' and] approve all others."[44]

The FMC faced a judicial challenge to its extension of a joint service agreement between carriers.  The court had already remanded the FMC's earlier opinion that addressed the protestant's concerns merely as being "without merit" and did not even mention antitrust or "public interest" considerations.[45]  The second time around, the court faulted the FMC for its "nearly exclusive focus" on whether lengthier evidentiary proceedings on the proposed agreement would unduly benefit the protestant's market position, rather than "any consideration at all of antitrust consequences" posed by the agreement itself: the very consideration required by Section 15 of the Shipping Act.[46]  The FMC had "an independent statutory responsibility" to demonstrate its consideration of the statutory criteria, and in any event, the protestant's "allegations were certainly sufficient to put the Commission on notice of the antitrust questions raised."[47]  Thus, a regulatory agency must explain, in a comprehensive and non-perfunctory way, how its decisions comport with statutory criteria, particularly if a commenter has raised the issue of statutory compliance, and a failure to do so renders its decision arbitrary or capricious.[48]  Here, because Order No. 3047 does not fulfill the Commission's

---

[44] *Id.* at 527-28.

[45] *See id.* at 528-29.

[46] *Id.* at 529-31.

[47] *Id.* at 531 (citation omitted).

[48] On the same day, the court remanded two other, unrelated FMC orders for the same reason: failure to show how the FMC had applied the statutory criteria.  *U.S. Lines, Inc. v. FMC (Combi Lines)*, 584 F.2d 543 (D.C. Cir. 1978); *Seatrain Int'l, S.A. v. FMC*, 584 F.2d 546 (D.C. Cir. 1978).  Particularly noteworthy here is the court's criticism of the FMC's order in *Combi Lines*: "[The FMC's assertion that it was 'mindful' of communications favoring extension of the relevant agreement] in no way amounts to a finding that public injury would result if the agreement were not extended or that the need to avoid such injury justifies

- 20 -

responsibility to adequately explain how its decision comports with the statutory criteria, it must be reconsidered.

### B.    The Commission Is Legally Bound to Respond Meaningfully to All Significant Comments.

The APA also requires agencies to give reasoned responses to all significant comments; if an agency fails to respond to specific challenges that are sufficiently central to its decision, then its decision is arbitrary and capricious.[49] An agency's failure to respond to comments is significant "insofar as it demonstrates that agency's decision was not 'based on consideration of the relevant factors.'"[50] "[A]n agency decision may not be reasoned if the agency ignores vital comments regarding relevant factors, rather than providing an adequate rebuttal."[51] Put another way, the key issue is whether the agency "met its obligation to make a record enabling [a reviewing court] to see why the agency reacted to major issues of policy as it did."[52] An agency's interpretation of an ambiguous statute will even be deemed unreasonable and denied *Chevron* deference if it does not "answer[ ] objections that on their face seem legitimate."[53]

A number of cases illustrate this principle. For example, in *PSEG Energy Resources & Trade LLC v. FERC*, an electricity generator contended that the agency's application of certain tariff rules "was 'inconsistent with the fundamental policy goals' of

---

extension notwithstanding the antitrust implications. Nor is it sufficient that the Commission's decision 'satisfies most, if not all, of the protestants' comments.'" 584 F.2d at 545 (citations omitted).

[49] *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) (citations omitted); *W. Coal Traffic League v. United States*, 677 F.2d 915, 927 (D.C. Cir. 1982).

[50] *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

[51] W. Coal Traffic League, 677 F.2d at 927.

[52] *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 41 (D.C. Cir. 1977) (internal quotation marks, elipses, parentheses, and citations omitted).

[53] *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 209 (D.C. Cir. 2011) (citations omitted).

the forward capacity market," such as incentivizing allocation of market resources to constrained areas.[54]  In remanding the agency's order, the court held that the agency was required to answer this and other facially legitimate objections; merely "characteriz[ing]" them, as the agency had done, was "not [enough] to answer them."[55] Moreover, although the agency accurately recited the underlying rule's purpose at one point, "the order does nothing more than make the quoted statement; it does not suggest that – let alone explain how – it was a response to PSEG's undue discrimination or policy arguments."[56]

Another case demonstrates that an agency cannot use a technicality to avoid addressing the substance of commenters' concerns, if those concerns bear on the final rule.  In *Louisiana Federal Land Bank Ass'n v. Farm Credit Administration*, a number of local lending institutions submitted comments objecting to the agency's proposal to lift geographic restrictions on certain lending activities, including arguments that the geographic restrictions were integral to the statutory scheme and furthered important policy goals.[57]  The agency implemented its proposal as a final rule for a subset of the originally proposed range of lending activities, and it noted merely that no commenter cited a statutory authority that mandated the historical geographic restrictions.[58]  On appeal, the agency claimed that it did not have to discuss the comments because they

---

[54] *Id.* at 210 (citation omitted).

[55] *Id.*

[56] *Id.*

[57] 336 F.3d 1075, 1079, 1080 (D.C. Cir. 2003) ("The plaintiffs complained that the Proposed Rule would, by authorizing 'out-of-territory lending,' effectively 'abolish Congress's carefully wrought statutory scheme of geographic boundaries and limitations.'" (citations omitted)).

[58] *Id.* at 1080.

took issue with the proposed rule's general approach and were not specifically directed
to the part of the proposed rule that remained relevant to the final rule.[59]  Nevertheless,
it was plain to the court that "the plaintiffs' comment was applicable equally to" the
agency's originally proposed approach and its final decision.[60]  The court's reasoning
bears quoting at length:

> We find unpersuasive the FCA's response that the plaintiffs' comment
> lacked adequate specificity to out-of-territory participations.  The plaintiffs
> argued that geographical boundaries were required by the Act and that the
> Proposed Rule would break down those boundaries; the Final Rule did
> just that.  True, it did so only as to participations, but that was not a trivial
> part of what the plaintiffs had argued was unlawful. . . . We interpret the
> plaintiffs' comment, in keeping with the rationale that underlies it, to relate
> to all forms of out-of-territory lending, including but not limited to
> participation in loans originated by others.  As such, their comment
> deserves an answer.[61]

Thus, a significant comment – particularly one that raises statutory objections –
deserves an answer if it implicates an agency's chosen approach in the final rule, even
if the comment was couched in terms of the proposed rule's scope.  As the following
subsections show, Order No. 3047 does not fulfill the Commission's responsibility to
respond to significant Postal Service comments, and it therefore must be reconsidered.

### C.  The Commission Failed to Meaningfully Explain How Its Final Rule Addresses the Statutory Criteria, Particularly in Light of the Postal Service's Comments.

In its comments in this proceeding, the Postal Service raised a number of
significant concerns about whether and how the Commission's proposed multifactor
framework would fulfill the objectives and account for the factors of 39 U.S.C. § 3622(b)-

---

[59] *Id.*

[60] *Id.*

[61] *Id.* at 1080-81.

(c).  The Commission barely acknowledges these comments.  Insofar as it does, it excuses itself from answering their substance on the technicality that they were nominally aimed at the originally proposed multifactor framework or commenters' alternative proposals (which, of course, were all that the Postal Service's comments could have discussed), without explaining how the formulation that the Commission ultimately used in Order No. 3047 avoids those very same concerns.  Moreover, a reformulation of the proposed standard does not absolve the Commission of its independent duty to apply the statutory criteria.  It is not enough to mention the criteria and baldly assert that the final rule fulfills them: the Commission must demonstrate its consideration of <u>how</u> its chosen approach best achieves the law's objectives and accounts for relevant factors.  Its failure to do so makes the resulting rule arbitrary and capricious.

For example, the Commission never mentions the Postal Service's lengthy discussion about the fundamental tension between case-by-case price cap treatment of mail preparation changes and the statutory objective of incentivizing efficiency (objective 1): to wit, cap treatment would create a perverse incentive to favor price increases over efficiency-oriented mail preparation changes, lest they cause some hard-to-predict cap effect, in favor of the eminently predictable impact of price increases.[62] The Postal Service even recalled numerous past Commission pronouncements that

---

[62] Reply Comments of the United States Postal Service, PRC Docket No. R2013-10R (Aug. 31, 2015) [hereinafter "USPS Reply Comments"], at 14-26.  The Commission's complete neglect of these 12 pages is particularly glaring in light of its characterization of virtually every other page of the Postal Service's reply comments.  *See also* Initial Comments of the United States Postal Service, PRC Docket No. R2013-10R (Aug. 17, 2015) [hereinafter "USPS Initial Comments"], at 17-18.

supported its concerns[63] and offered a concrete, real-world example (a Postal Service rulemaking about address label placement and formatting) to demonstrate how those concerns would bear on actual practice beyond the specific IMb and flats-bundling changes in Order No. 1890.[64]  While the Postal Service's reply comments were nominally critiquing proposals by other commenters, it is clear that the same concerns apply to any case-by-case approach to determining cap treatment of mail preparation changes, including the one that the Commission announced in Order No. 3047.

Beyond the efficiency objective, the Postal Service pointed out that an

ad hoc balancing exercise would fail to achieve any of the very objectives that the Commission's system for regulating rates and classes is statutorily required to achieve.  By shrouding outcomes in mystery until the Commission issues a final order revealing how it has balanced the many factors and considerations, this approach would vitiate, not enhance, predictability and stability in rates (objective 2) and the transparency of the ratemaking process (objective 6).  In a premonition of the court's insistence upon "meaningful guidance," the legislative history underlying these statutory commands emphasizes the importance that Congress placed on "extremely clear and well-defined standards . . . established by regulation allowing the Postal Service and the Postal Regulatory Commission to make a rapid determination of whether a rate adjustment meets the applicable criteria." . . .

Indeed, the current price cap, predicated as it is on a measure of household inflation rather than a measure that more accurately considers the Postal Service's costs – which are the product of its universal service obligation, its binding interest arbitration process, and its other statutory obligations – already significantly inhibits the Postal Service's ability to be financially stable and threatens its ability to provide adequate and efficient service (objective 5).  By presenting the Postal Service with a choice of either increasing rates or enhancing its operational practices, but not doing both, the Commission's approach simply exacerbates the Postal Service's difficulties.[65]

---

[63] USPS Reply Comments at 16 fn.34-37, 25 fn.56; *see also* USPS Initial Comments at 18 fn.41, 20 fn.45.

[64] USPS Reply Comments at 19-26.

[65] USPS Initial Comments at 17-18 (footnotes omitted, first alteration in original).

- 25 -

Moreover, in response to suggestions that the Commission adopt an approach based on the magnitude of mailer costs – as the Commission ultimately did in Order No. 3047 – the Postal Service warned that

> mitigating or recompensing mailer costs is not a factor, objective, or policy of the Act.  To be sure, concerns about compliance cost might drive behavior that indirectly affects certain factors or objectives, which would need to be balanced against each other in any event.  To the extent that costs would drive mail volume out of the system, the Commission would need to account for 39 U.S.C. § 3622(c)(4) (alternatives to mail) against the backdrop of the mandatory objective in Section 3622(b)(1) (interest in maximizing incentives to reduce costs and increase efficiencies) and factors (c)(5) (degree of mail-preparation performed by the mailer and its effect on reducing Postal Service costs) and (c)(10) (special classifications that enhance the performance of mail-preparation and processing).  These matters are more appropriately dealt with through the classification, complaint, or annual compliance review process than through a price change.[66]

Although the Postal Service did not advert to other factors directly in its comments, the statute also requires the Commission to take into account "the importance of pricing flexibility to encourage increased mail volume and operational efficiency" (factor 7), "the need for the Postal Service to increase its efficiency and reduce its costs, including infrastructure costs, to maintain high quality, affordable postal services" (factor 12), and – perhaps the most self-evidently pertinent factor in the context of this proceeding, a central theme of which has been the Postal Service's proposal to incentivize more mailers to shift to the Full-Service IMb – "the value to the Postal Service and postal users of promoting intelligent mail and of secure, sender-identified mail" (factor 13).

---

[66] USPS Reply Comments at 26 fn.57.

To be sure, Order No. 3047 does mention the Postal Service's brief treatment of similar points in its initial comments.[67]  The Commission even quotes the Postal Service's criticism that the Commission's approach would be "'open-ended [and] subjective' and leave the Postal Service 'with no basis to determine, with any sense of confidence, whether operational changes will implicate the cap as the Postal Service considers such changes and plans its prices.'"[68]

Faced with these concerns about tension between the Commission's proposed case-by-case approach and the statutory objectives and factors, the Commission reduces the Postal Service's comments to merely a vote against the <u>form</u> of the multifactor framework and assumes that it is enough for "the Commission [to] move[ ] forward instead with a more streamlined standard."[69]  Order No. 3047 lacks any explanation of how the Commission's chosen approach would resolve or avoid the statutory conflicts that the Postal Service identified, or of how the Commission's approach squares with its past pronouncements about the importance of efficiency incentives to the statutory scheme and the need to encourage Full-Service IMb adoption.

Rather than explaining <u>how</u> its new standard best achieves the statutory objectives, the Commission merely asserts <u>that</u> it does:

> The standard ultimately adopted by the Commission and explained *supra* at section III appropriately balances the operational realities of mail preparation requirement changes with the considerations of the price cap statute when defining what constitutes a deletion and redefinition of a rate cell under 39 C.F.R. § 3010.23(d)(2).  As discussed previously, the

---

[67] Order No. 3047 at 53-54.

[68] *Id.* at 53 (quoting USPS Initial Comments at 6).

[69] *Id.* at 58.

Commission is in the best position to design a process to ensure
transparency and accountability of the Postal Service through regulation of
the price cap statute.  When faced with the task of providing a reasonable
standard by which changes to mail preparation can be determined to have
rate effects with price cap implications, the Commission through this Order
announces a standard that incorporates Commission expertise, judgment,
and experience as opposed to a bright-line rule.[70]

In essence, the Postal Service argued that a case-by-case approach based on a

multifactor framework would be too open-ended, subjective, and unpredictable, and so

the Commission adopted a case-by-case approach that was based solely on its open-

ended, subjective, unpredictable discretion.

As the cases in section IV.A above show, the Commission has a duty to explain

how its final rule fulfills the statutory criteria, particularly in light of comments that explain

in detail how a similarly judgmental, case-by-case approach would fail to do so.  Yet the

Commission does not even acknowledge the existence of the fourteen factors in 39

U.S.C. § 3622(c) that it is required to "take into account" – including, most glaringly, the

factor about promoting intelligent mail.  As for the nine objectives in 39 U.S.C. § 3622(b)

that "shall" be achieved through the Commission's policy decision and must therefore

guide that decision, the Commission alludes to a handful of them only twice in

connection with its standard, and then only in a conclusory fashion.  In the first instance,

it merely recites three of them and claims to be have been "mindful" of them "[i]n

developing its standard."[71]  In the second instance, the Commission recites a somewhat

larger subset of the statutory objectives and

concludes that these objectives support applying a standard that looks to
whether the mail preparation change triggers compliance with the price

---

[70] *Id.* at 58-59.

[71] Order No. 3047 at 3.

- 28 -

cap rules by measuring whether the rate cell has been effectively eliminated or redefined by significant changes to a basic characteristic of the mailing.  39 C.F.R. § 3010.23(d)(2).  The standard provides for a fair and reasonable assessment of preparation changes that will allow the Postal Service to continue improving the efficiency of its operations with minimal administrative burden yet will protect mailers from operational changes that impose significant costs and operational adjustments without regulation under the price cap statute.[72]

This perfunctory discussion is simply a statement of the Commission's conclusions, not an explanation the reasoning that led to those conclusions.  Yet, as noted in section IV.A above, a "persuasive explanation" and a "statement . . . of reasoning" is precisely what the Commission must provide; "conclusory statements will not do."[73]  Nor are the Commission's remarks an answer to the Postal Service's arguments about how a case-by-case, discretionary approach would fail to fulfill the various objectives or how its bright-line proposals would fulfill those objectives.  The Commission's generic assertions of "mindful[ness]" and statutory "support" for its preferred standard do not explain why the Commission believes its approach fulfills the statutory objectives better than alternative proposals; indeed, the Commission could have used the exact same platitudes if it had adopted the Postal Service's proposals.[74] The lack of adequate reasoning is all the more apparent because, as stated in the

---

[72] *Id.* at 18-19.

[73] *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citations and emphasis omitted); *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 882 (D.C. Cir. 1999).

[74] *See Arrington v. Daniels*, 516 F.3d 1106, 1114 (9th Cir. 2008) (invalidating a Bureau of Prisons rule where the stated rationale, a "general desire for uniformity[,] provide[d] no explanation for why the Bureau exercised its discretion to achieve consistency through" the particular rule that it adopted, as opposed to an alternative approach; "[a]lthough either choice in all likelihood would have withstood judicial scrutiny, . . . [t]he agency's lack of explanation for its choice renders its decision arbitrary and capricious"); *Radio-Television News Dirs. Ass'n*, 184 F.3d at 883-85 (acknowledging the agency's invocation of various public-interest rationales, but finding, as a basis for remand, that the agency failed to explain how those rationales led to its chosen approach as opposed to some other approach); *Nat'l Citizens Comm. for Broad. v. FCC*, 567 F.2d 1095, 1113 (D.C. Cir. 1977) (faulting the agency for "not explain[ing] adequately why [a commenter's alternative] proposal does not meet most of" the criteria that the agency articulated in supporting its decision).

Postal Service's earlier comments quoted above, none of the statutory objectives, factors, or policies speak to the mitigation of mailer costs.  In this regard, Order No. 3047 recalls the FMC order in *Euro-Pacific*, which the court remanded on account of the agency's failure to demonstrate its consideration of the statutory criteria, particularly in light of a commenter's allegations that the agency's approach would violate those criteria.

Nor does Order No. 3047 satisfy the APA's "obligation to make a record enabling [a reviewing court] to see why the agency reacted to major issues of policy as it did."[75] The Postal Service raised "vital comments regarding relevant factors," which deserve "an adequate rebuttal."[76]  Indeed, the Commission's response closely resembles the actions of the agencies in *PSEG Energy* and *Louisiana Federal Land Bank Ass'n*.  As discussed in section IV.B above, these cases show that merely characterizing comments, particularly comments concerning statutory compliance, is not enough to answer them.  Even significant comments that raise problems about a proposal in general – such as about a case-by-case approach, expressed as a multifactor framework in Order No. 2586, or about proposals to analyze "magnitude" in terms of mailer costs – warrant a substantive answer, to the extent that they apply to the final rule as well.  Order No. 3047 commits the same errors as the ill-fated agency actions in those cases, and so the Commission would do well to reconsider its decision.

To emphasize the point using just one example of the various unanswered statutory arguments that the Postal Service raised, the Commission does not even

---

[75] *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 41 (D.C. Cir. 1977) (internal quotation marks, ellipses, parentheses, and citations omitted).

[76] *W. Coal Traffic League v. United States*, 677 F.2d 915, 927 (D.C. Cir. 1982).

acknowledge the Postal Service's argument that, by depriving it of much-needed price cap authority in a time of financial stress, any cap treatment of mail preparation changes runs directly counter to objective 5, or even that objective 5 exists.  Under the present circumstances, it is far from self-evident how the Commission can "conclude[ ]" that the objectives of "allowing the Postal Service pricing flexibility" and "establishing a just and reasonable schedule for rates and classifications" "support applying a standard that" takes away price cap authority on account of mail preparation changes that are either efficiency-enhancing or serve other valuable purposes (such as enhancing the value of the mail).[77]  In short, Order No. 3047 contains none of the sort of "persuasive explanation" of statutory criteria or answer to legitimate concerns that the APA requires of the Commission.

Order No. 3047's only other mention of the statutory objectives casts this deficiency in ironic contrast, as the Commission finds fatal to other commenter's proposal some of the same issues that the Postal Service raised about the Commission's case-by-case, discretionary approach: administrative burden (objective 6), uncertainty (objective 2), and inconsistency with prior Commission positions.[78] Inasmuch as the Commission sees fit to explain why one alternative proposal fails to fulfill certain statutory objectives, the Commission's failure to explain the supposed superiority of its own approach is particularly conspicuous.

The Commission must do more to show how its insistence upon its case-by-case, discretionary approach, predicated on penalizing the Postal Service for requiring

---

[77] *See* Order No. 3047 at 18-19.

[78] *Id.* at 45.

mailers to implement operational adjustments that enhance efficiency or serve other important purposes, achieves the objectives of 39 U.S.C. § 3622(b) and accounts for the factors of 39 U.S.C. § 3622(c), particularly in light of the Postal Service's significant arguments to the contrary. The failure to make that showing renders Order No. 3047 arbitrary or capricious, and it therefore should be reconsidered.

### D.    The Commission Failed to Address Significant Comments About Its Promise to Establish an Intelligible Standard That Can Be Applied to the Elimination of Return Receipt for Merchandise Service.

The Commission has failed to answer another significant aspect of the Postal Service's comments: the reminder that, pursuant to its agreement with the Postal Service in moving to remand Order No. 2322, the Commission must establish an "intelligible standard" and use it to determine whether the elimination of the Return Receipt for Merchandise (RRM) service is a "change in rates" under that standard.[79]  As the Postal Service wrote in its initial comments,

> [t]he Postal Service urges the Commission to acknowledge that the elimination of an entire service does not change any prices, and therefore does not implicate the price cap.  Rather, the elimination of the service is to be evaluated and approved or rejected in its own right under the Commission's rules in 39 C.F.R. Part 3020, which incorporates many of the same concerns as those that the Commission has attempted to work into its proposed framework.  <u>If the Commission disagrees, then it needs to develop a standard that will clearly determine under what circumstances the elimination of a service could have price cap implications.</u>[80]

The Postal Service went on to discuss the practical impact on its business and operational decisions that would result from according cap treatment to the elimination

---

[79] USPS Initial Comments at 9.

[80] *Id.* at 9-10 (emphasis added, footnote omitted).

of an entire service.[81]  The Postal Service pointed out that the Commission's treatment of RRM was inconsistent with two prior Commission decisions and called on the Commission to shed "additional light on how such cases could be resolved in a consistent and predictable manner."[82]

In Order No. 3047, the Commission acknowledged that the Postal Service made (some of) these comments.[83]  Like the Postal Service's concerns about statutory compliance, the Commission reduced the Postal Service's remarks about Order No. 2322 to merely another objection to Order No. 2586's multifactor framework and failed to include any substantive response at all in the "Commission Analysis" that followed.[84] This is clearly an insufficient answer to a vital comment.[85]

Nor does the standard adopted in Order No. 3047 render the Postal Service's concern any less relevant.  Indeed, the standard in Order No. 3047 leaves wholly unanswered the question of how the Commission would treat the elimination of an entire service.  Order No. 3047 speaks only to when "a mail preparation change will be considered a classification change with price cap effects requiring compliance with 39 C.F.R. § 3010.23(d)."[86]  The standard addresses "when the mail preparation change causes the elimination of a rate, or the functional equivalent of the elimination of a

---

[81] *Id.* at 16.

[82] *Id.* at 16 fn.38.

[83] Order No. 3047 at 54.

[84] *See id.* at 57-58.

[85] By raising the RRM issue here, the Postal Service does not wish to delay any work that the Commission may be undertaking in a separate venue.  The Postal Service is anxious to learn as soon as possible how the Commission views this issue, both with respect to the continued offer of RRM, contrary to the Postal Service's business judgment, and to any other services that the Postal Service may consider to warrant elimination.

[86] *Id.* at 1 (emphasis added).

rate,"[87] but not what should happen when the Postal Service proposes to eliminate a service entirely, rather than proposing either to change a mail preparation requirement for that service or to eliminate a rate for the service.  The standard in Order No. 3047 offers no more guidance on this issue than did Order No. 2586's multifactor framework, and so any formal distinction between the two cannot excuse a failure to address the Postal Service's concerns.  The Commission should reconsider Order No. 3047 in order to address the Postal Service's comments on this issue.

## V.   THE COMMISSION'S STANDARD FAILS TO PROVIDE CLEAR GUIDANCE AND POSES PRACTICAL PROBLEMS THAT ORDER NO. 3047 DOES NOT RESOLVE

### A.   The Postal Service and Other Parties Cannot Assess Significance in a Meaningful Way, in Light of the Lack of Insight Into Mailer Costs.

As discussed in section III above, the Commission predicates its "significance" standard on "the operational adjustments and/or costs required by the mailer for compliance with the new mail preparation requirement."[88]  However, the Commission has specifically recognized in other, but related, contexts that neither the Postal Service nor the Commission has access to detailed mailer cost information, or a ready means to obtain it.[89]  Accordingly, the Commission should reconsider its standard in order to reconcile it with its prior position.

---

[87] *Id.* (emphasis added).

[88] *Id.* at 17.  Although it appears that the Commission may analyze operational adjustments and costs separately, *see id.* at 23-25, how mailers might deploy significant operational adjustments without also incurring significant costs is unclear.  This discussion accordingly focuses on mailer costs, which the Postal Service views as also encompassing operational adjustments.

[89] Annual Compliance Determination Report, Fiscal Year 2010, PRC Docket No. ACR2010 (Mar. 29, 2011) [hereinafter "FY10 ACD"], at 83.

In its reply comments, the Postal Service asserted that determinations of mailer costs are bound to be unreliable and speculative.[90]  The Commission dismisses this concern by stating simply that "[c]hanges that are large in magnitude will have substantial costs and operational adjustments that will be apparent to the Postal Service, the mailing community, and the Commission in light of the collective experience with mail preparation changes."[91]  But that is precisely the point of the Postal Service's comment: the magnitude of mailer costs and operational adjustments required to comply with a given mail preparation change is in fact <u>not</u> apparent.[92]

The Commission needs to reconcile the significance standard with its prior position that accurate, detailed information on mailer costs is unavailable.[93]  Indeed, in its Fiscal Year 2010 Annual Compliance Determination (FY 2010 ACD), the Commission rejected a proposal that the Postal Service should be required to estimate mailer costs each time it changes a mail preparation requirement.[94]  In that docket, the National Postal Policy Council (NPPC) submitted comments urging the Commission to "require the Postal Service to conduct a cost-benefit analysis when it contemplates a compliance change to identify and calculate the uncompensated 'shadow' costs

---

[90] USPS Reply Comments at 30-31 ("At best, the Postal Service would have to make determinations on the basis of incomplete and anecdotal representations from mailers; at worst, the Postal Service would have to make its own judgments based on speculation or else forgo changes entirely.").

[91] Order No. 3047 at 17.

[92] This is especially true at the time of the Postal Service's proposal to change mail preparation requirements.  No mailers would yet have submitted comments, yet that is when the Postal Service needs to decide whether the mail preparation change would be subject to the price cap, according to the Commission's approach.

[93] See USPS Reply Comments at 30 ("[T]he Commission has previously declined similar suggestions to factor changes in mailers' compliance costs into the price cap, because of the difficulty of obtaining information on mailer costs.").

[94] FY10 ACD at 83; see Comments of the National Postal Policy Council on Annual Compliance Review, PRC Docket No. ACR2010 (Feb. 2, 2011) [hereinafter "NPPC FY10 ACR Comments"], at 9-10.

incurred when it changes mailing regulations or entry requirements," and "to include in the ACR an estimate of the uncompensated costs it imposed during the year that effectively resulted in shadow rate increases."[95]  Among other examples, the NPPC specifically pointed to Full-Service IMb in arguing that mailers' compliance costs should be accounted for through adjustments to the price cap.[96]

> The Commission rejected this proposal, taking the position that
>
> [a]ny cost-benefit analysis designed to calculate "uncompensated shadow costs" incurred by mailers would require accurate, detailed information on mailers' costs. Neither the Postal Service nor the Commission has access to such information or a ready means to obtain it. Moreover, mailers, rightfully, may be reluctant to divulge such information.[97]

This is patently inconsistent with the standard that the Commission ultimately adopted in Order No. 3047.  The Commission's about-face is especially troubling because the NPPC brought Full-Service IMb to the Commission's attention when the Commission determined in 2011 that detailed and accurate information would be necessary to estimate mailers' costs, but that such information would not be available."[98]  The Commission must reconsider the approach it takes in Order No. 3047 and explain why detailed cost information is either now available or no longer necessary.[99]

The Commission tries to reassure the Postal Service that "the significance analysis does not require knowing the exact cost to a mailer as a result of the mail

---

[95] NPPC FY10 ACR Comments at 10.

[96] *Id.* at 8, 9.

[97] FY10 ACD at 83.

[98] *Id.*

[99] *See LePage's 2000, Inc. v. Postal Regulatory Comm'n*, 642 F.3d 225, 233-34 (D.C. Cir. 2011) (vacating and remanding a Commission order on nonpostal services because "the Commission altered its analytic frame" from an earlier order in the same proceeding but "offered no reason for this departure").

preparation change."[100]  However, detailed and accurate data are critical to supporting a determination of mailer costs that is capable of withstanding challenge by mailers, who are in the best position to demonstrate what their costs are.[101]  Given this fact, how exactly will the Postal Service or the Commission assess mailer costs in any objective fashion?

In applying the "significance" standard to the Full Service IMb requirement, the Commission relies on an audit report by the United States Postal Service Office of Inspector General (OIG) for evidence of mailer costs.[102]  Reliance on this report, however, only underscores that the significance standard will inject administrative wrangling and uncertainty into postal rulemakings.  For one, OIG reports are not going to exist for most mail preparation changes, and the OIG itself acknowledged that "[t]he Postal Service may find it difficult to staff or fund new cost-estimate efforts due to its current financial condition."[103]

Moreover, the audit report simply repeats cost figures that were reported by the mailers themselves.[104]  The Commission seems to expect that "the collective experience [of the Postal Service, mailers, and the Commission] with mail preparation changes" will counterbalance mailers' incentive to avoid regulation or obtain cap price

---

[100] Order No. 3047 at 17.

[101] *See id.* at 20-21.

[102] *Id.* at 26 (citing United States Postal Service Office of Inspector General, Report No. MS-AR-11-006, Effects of Compliance Rules on Mailers 3 (Aug. 24, 2011) [hereinafter "OIG Report"]).

[103] OIG Report at 3.

[104] *Id.*

relief by overstating costs.[105]  However, even with all stakeholders acting in good faith, getting close to a consensus on cost figures is unlikely.

Further, the costs that mailers reported to the OIG vary substantially, from $0.40 million to $3.25 million in first-year costs and $50,000 to $500,000 in recurring costs for "larger mailers" alone.[106]  Even if the Postal Service had access to the detailed information necessary to verify the accuracy of these figures, how could it be expected to arrive at an objective determination of whether the change is significant when the high- and low-end estimates vary by as much as a factor of ten?  Even if the Postal Service were to receive "direct information from the mailing community" about the costs of coming into compliance with a change (as the Commission states that it received for Full-Service IMb),[107] that information is not likely to be adequate.

Ultimately, Order No. 3047 does not attempt an objective evaluation of mailer costs so much as rely on "the Commission's experience."[108]  However, the Commission has no experience auditing or regulating mailers' costs.  Indeed, the Commission cannot have any such experience, given that its regulatory authority is confined to the Postal Service as an entity and does not extend to the mailing industry as a whole.  The Postal Service's own thoroughly-reported finances have been the subject of more than four decades of dialogue about what makes cost information reliable; by contrast, the Commission's interest in making mailer costs the basis of pricing regulation is novel and untested.  Moreover, as discussed in section II.A above, reliance on "experience," rather

---

[105] *See* Order No. 3047 at 17.

[106] OIG Report at 3.

[107] Order No. 3047 at 26.

[108] *Id.*

than a transparent and predictable standard, amounts to "I know it when I see it," which is not an legally sufficient basis for agency decisionmaking.

Then there is the question of which costs are relevant to the significance analysis.  Does the standard consider only those costs that mailers incur as a direct result of the change, or does it also consider indirect costs, as mailers have proposed in the past?[109]  Is it limited to investments made solely to comply with the requirement change, or does it consider investments mailers make in order to realize internal or secondary benefits?  At what point in time relative to the announcement or implementation of a mail preparation change do mailer investments count?  Must the Postal Service forecast mailers' costs, and if so, how far into the future?[110]

Conversely, how should the Postal Service treat investments that mailers make voluntarily, before it formally announces the intent to make a particular mail preparation method a requirement?  Are costs incurred by mailers who adopt a mail preparation method before the Postal Service formally proposes to make it a requirement relevant?  In other words, should cost analysis be limited to those mailers that would face an increase in the price they pay because they did not adapt to the rule change?  Indeed, it would seem that counting voluntary investments made by early adopters of a mail preparation method could overstate mailer costs, but not counting them might discourage early adoption.

---

[109] *See* NPPC FY10 ACR Comments at 9 (arguing that the cap analysis should account for "not only direct, but indirect costs and burdens to mailers from the timing of change or otherwise").

[110] For example, in analyzing the Full-Service IMb requirement, the Commission considered widely varying mailer estimates of their "recurring annual expenditures."  Order No. 3047 at 26 (citing OIG Report at 3).  However, it is not apparent from the OIG Report how long these mailer-reported recurring costs might persist.

Moreover, the costs of converting to a new mail preparation method may decrease over time as mailers that switch later take advantage of lower-cost conversion paths developed for early adopters.  For example, assume the Postal Service offers an incentive for mailers that adopt a new mail preparation method, which requires mailers to make certain software changes.  Of eligible mailers, 50 percent make the necessary investments in exchange for discounted rates.  If the Postal Service later makes the mail preparation method a requirement and, in the meantime, software providers have made lower-cost solutions available to individual mailers and mail service providers, the associated compliance costs will have declined for those initially deemed to be at risk of being forced into a higher price category, and these "late adopters" might now find it worthwhile to make the change and get the lower price after all.

In addition, as the Postal Service develops mail preparation changes, it frequently works with mailers to simplify the operational adjustments they may have to make.  In the case of Full-Service IMb, for example, by April 2012, when the Postal Service published advanced notice of the proposed rule change,[111] just over 50 percent of eligible mail volume had voluntarily shifted to Full-Service.[112]  In exchange, mailers received discounted prices and the benefit of increased visibility into the mailstream. Over that time, "[t]he Postal Service . . . worked closely with mailers, software providers, and mail service providers to simplify, refine and evolve [its] Full-Service offerings[.] Even after the proposal was published, "[t]he Postal Service continue[d] to develop new tools, and to enhance and simplify existing tools, to make it easier for mailers to prepare

---

[111] Advance Notice of Implementation of Full-Service Intelligent Mail Required for Automation Prices, 77 Fed. Reg. 23643, 23645 (Apr. 20, 2012).

[112] This is according to data in the Postal Service's PostalOne! data system.

and submit Full-Service mailings."[113]  It is likely that these efforts reduced the cost of

complying with the Full-Service IMb requirement by the time it was published as a

proposed rule in October 2012[114] and as a final rule in April 2013.[115]  The Postal

Service's decision whether to announce in these rules that the costs were significant

enough to justify a price cap impact would be far from clear.

 Finally, the Postal Service disagrees with the Commission's finding that the cost

estimates cited in the OIG report are necessarily "extraordinary."[116]  Leaving aside the

unknown reliability of those estimates, it is entirely unclear what they represent in the

context of a given mailer's size and scale, or whether they would actually lead the

mailer to forgo adopting Full-Service IMb.  As an example, assume that the $3.25

million first-year cost figure and the $500,000 recurring cost figure represent the same

large mailer, and that this mailer sends 400 million pieces of affected First-Class Mail

per year.[117]  Over a five-year period (an eminently reasonable amount of time over

which to measure the value of an investment), the increased cost would amount to only

$0.0026 per piece.[118]  Meanwhile, the mailer will have reaped the First-Class Mail Full-

Service IMb discount of $0.003 for each of the 2 billion pieces mailed in those five

---

[113] 77 Fed. Reg. at 23645.

[114] Implementation of Full-Service Intelligent Mail Requirements for Automation Prices, 77 Fed. Reg. 63771 (Oct. 17, 2012).

[115] Implementation of Full-Service Intelligent Mail Requirements for Automation Prices, 78 Fed. Reg. 23137 (Apr. 18, 2013).

[116] Order No. 3047 at 26.

[117] Postal Service data indicate that these volume and discount figures are realistic for a large mailer with Full-Service-eligible mailings.  This hypothetical does assume a perhaps-unrealistic level of costs, however: the OIG Report does not indicate whether both upper-bound cost figures necessarily relate to the same mailer, or whether the recurring costs necessarily persist at the same level for any given number of years.

[118] [$3.25 million cost in first year + ($0.50 million recurring cost x 4 years) = $5.25 million total cost] / [(400 million pieces per year x 5 years) = 2,000 million pieces] = $0.0026 average cost per piece.

- 41 -

years.  This mailer would spend $5.25 million to gain $6 million in postage savings: a

return on investment of at least 14.3 percent over the five years.  The mailer's gains

could be significantly higher, considering that it would receive free Address Correction

Service, for which the Postal Service charges non-Full-Service mailers $0.05 or more

per address change.[119]  Thus, as would be expected in the business environment, a

large mailer's investment in Full-Service IMb is justified by its own economics.  The

investment therefore hardly seems "extraordinary," much less substantial enough to

assume that the mailer would necessarily default into non-automation rates and pass up

the opportunity to get the Full-Service IMb discount and its associated benefits.

The analysis in this hypothetical recalls how the Commission itself has evaluated

the Postal Service's costs to comply with Commission requirements.  The Commission

declined to relieve the Postal Service of a Commission-imposed regulatory requirement

that was projected to impose $3.8 million in implementation costs in the first year and

$3.3 million in recurring costs thereafter.[120]  In that context, the Commission was

unmoved by the absolute dollar value of the implementation costs (values that

significantly exceed those in the OIG Report).  Rather, the Commission looked at the

cost increase on a per-piece basis and compared it with the overall scale of the affected

mail, in terms of revenue and cost coverage.[121]  In light of the Commission's previous

proportionality-based approach to evaluating compliance costs' significance, it is

---

[119] 78 Fed. Reg. at 23138.

[120] Order No. 745, Order Concerning Temporary Waivers and Semi-Permanent Exceptions from Periodic Reporting of Service Performance Measurement, PRC Docket Nos. RM2011-1, RM2011-4, & RM2011-7 (June 16, 2011), at 20-21.

[121] *Id.*

unclear why the Commission would now deem a mere (unverified) absolute dollar figure as a *per se* indicator of significance.

Ultimately, the Postal Service's lack of access to the detailed mailer cost information required to accurately and objectively assess the magnitude of a change seriously interferes with the Postal Service's ability to implement needed mail preparation changes.  When deciding whether to propose a change, the Postal Service will need to evaluate whether the Commission would consider it to be subject to the price cap, and, in many cases, the Postal Service's decision whether to go forward with the change will depend on whether doing so will cost the Postal Service price cap space.  In the case of Full-Service IMb, the Postal Service ultimately had to withdraw the requirement because the Commission determined that moving forward not only would have required forgoing the price changes proposed in Docket No. R2013-10, but also would have required the Postal Service to lower First-Class Mail and Standard Mail prices below their then-current levels in order to make up for the large amount of price cap space attributable to Full-Service under the Commission's approach.[122]  If the Postal Service had known that the Full-Service IMb requirement would have a large cap impact, it either would not have initiated the rulemaking, or would have planned to implement the Full-Service IMb requirement in stages.  Under Order No. 3047, the Postal Service would face similar decisions when it is contemplating whether to propose

---

[122] Order No. 1890 at 1-2; *see also* Compliance Calculations for First-Class Mail, Excel file "CAPCALC-FCM-R2013-10 PRC.xls," tab "Percent Change Summary," PRC-LR-R2013-10/1, PRC Docket No. R2013-10 (Nov. 21, 2013); Compliance Calculations for Standard Mail, Excel file "PRC CAP-CALC-STD-R2013-10.xls," tab "Price Change Summary," PRC-LR-R2013-10/1, PRC Docket No. R2013-10 (Nov. 21, 2013).

other rule changes, and it would need detailed cost information as part of that analysis (even before preparing a *Federal Register* notice).

Because such information is unavailable, it is unclear how the standard offers any predictability or certainty for the Postal Service or mailers, despite the court's direction that it do so.  As with the matters discussed in section IV above, the Postal Service raised concerns in its reply comments about the availability and reliability of mailer cost information,[123] yet Order No. 3047 fails to persuasively explain how the Commission's standard would address this concern.  The Commission must reconsider Order No. 3047 in order to give effect to the court's order and the Commission's own APA responsibilities.

**B.    Order No. 3047's "Significance" Requirement is an Amorphous Standard That Fails to Provide Clarity or Meaningful Guidance.**

The Commission's standard fails to provide meaningful guidance as to which mail preparation requirement changes will have rate effects, as directed by the court,[124] and its discussion of the standard fails to clear up that deficiency to a sufficient degree. The Commission says that the significance requirement

> is meant to capture those mail preparation changes that are the type of <u>rare large scale system changes</u> that effectively redefine the rate cell. Therefore, with this standard, the Commission confines the scope of mail preparation requirement changes to those that are <u>large in magnitude compared to the routine operational changes that the Postal Service has frequently implemented in the past</u>.[125]

On the one hand, the Commission's statement about how the price cap applies to only "rare" changes suggests that the cap will only sparingly be implicated by a mail

---

[123] USPS Reply Comments at 31.

[124] *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 753-57 (D.C. Cir. 2015).

[125] Order No. 3047 at 17-18 (emphasis added).

preparation change.  In the case of Full-Service IMb, the Commission emphasizes the "extraordinary" impact of the requirement change on mailers.[126]  On the other hand, because the Commission only distinguishes such "rare" events from "routine" changes that are "frequently" implemented, the standard's limitations are unclear.  There is a large, undefined gap between "rare large scale system changes" and "routine operational changes."

At the very least, if the Commission determines to keep its standard, the Postal Service and mailers need more clarity.  In its initial and reply comments, the Postal Service discussed a number of previous mail preparation requirements that might or might not be deemed to have a price cap impact.[127]  The Commission should address how its standard would apply to each of those changes.  Specifically, the Postal Service discussed the 2010 change in deflection standards for flat-shaped mail,[128] which required some mailers to change the design or production of their mailpieces in order to make them less flexible so that they qualify for automation rates.[129]  Likewise, the Commission should clarify how the standard applies to the 2009 change in selvage specifications[130] and the 2009 change in address requirements for automation, presorted, and carrier route flat-sized mail.[131]  Although the Commission's

---

[126] *Id.* at 26.  As discussed in section V.A above, however, there is serious cause for doubt about whether the Full-Service IMb requirement is truly "extraordinary."

[127] USPS Initial Comments at 13-14; USPS Reply Comments at 19.

[128] Eligibility for Commercial Flats Failing Deflection, 75 Fed. Reg. 12981 (Mar. 18, 2010).

[129] USPS Initial Comments at 13.  The Public Representative also speculated about whether this change would be treated as a *de facto* price change.  Public Representative Reply Comments, PRC Docket No. R2013-10R (Aug. 31, 2015), at 4.

[130] New Standards for Domestic Mailing Services, 74 Fed. Reg. 15380, 15381 (Apr. 6, 2009).

[131] New Address Requirements for Automation, Presorted, and Carrier Route Flat-Sized Mail, 73 Fed. Reg. 25509 (May 7, 2008).

- 45 -

announcement of a new standard does not warrant retroactive application, the

Commission should use these examples to illustrate to the Postal Service and mailers

how the standard would work in practice.

The Postal Service and mailers would also benefit from further clarification of the

standard's application to the Full-Service IMb requirement.[132]  The Commission held

that the Full-Service IMb program as a whole effectively redefined rate cells.  But that

program, as planned for implementation in 2014, consisted of multiple requirement

changes, each of which, standing alone, might or might not be deemed to implicate the

price cap.[133]  Assume that the Postal Service decided to first implement only the

Electronic Documentation requirement.  Would that, standing alone, have been

considered a "large scale system change" with cap effects under the standard?  If the

Postal Service then decided to implement the Intelligent Mail barcoding requirements

two years later, would mailer investments in Electronic Documentation be excluded from

the cost analysis?  Suppose the Postal Service could somehow determine that the

entire Full-Service IMb program would cost an average mailer $1 million: how would it

---

[132] The Commission once again mistakenly claims that the Postal Service adjusted billing determinants to account for the price cap effects of the Full Service IMb requirement for the Package Services class, and that this adjustment amounts to a purported "acknowledg[ment] that the IMb program was subject to the price cap limitation."  Order No. 3047 at 26.  This is simply not the case.  The Postal Service has previously made clear, and reiterates now, that the Package Services billing determinants adjustment were entirely unrelated to Full-Service IMb.  Reply Brief of the United States Postal Service at 7-9, *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740 (D.C. Cir. 2015) (No. 13-1308); *see also* Response of the United States Postal Service to Chairman's Information Request No. 8, PRC Docket No. R2013-10 (Nov. 5, 2013), Question 8.c.  In fact, the billing determinant adjustments for Package Services reflected the removal of a POSTNET barcode discount previously available for Bound Printed Matter Flats.  The Commission demonstrated in Order No. 1890 that it understood that the Postal Service was removing the POSTNET discount.  Order No. 1890 at 98 ("The Postal Service proposes to remove a barcode discount previously available for both presorted and non presorted automation compatible BPM Flats. The discounts were available to customers using POSTNET barcodes and were previously eliminated for other Package Services products in Docket No. R2012-3.").  The Commission is in error to the extent that its Full-Service IMb holding is based on the Postal Service's billing determinants adjustments for the Package Services class.

[133] *See generally* 78 Fed. Reg. 23137 (Apr. 18, 2013).

allocate that $1 million between the Electronic Documentation and barcoding requirements in order to reasonably evaluate whether it could avoid a price cap impact by implementing the Full-Service IMb program incrementally?  Even the OIG audit report did not estimate mailer costs at this level of detail.

Indeed, the Postal Service needs certainty to determine whether to move forward with changes that improve operational efficiency, especially if those changes will be treated as having rate effects that impact the price cap.  Under the Commission's standard, if the Postal Service decides to move forward with a mail preparation requirement change based on a preliminary determination that the change does not implicate the price cap, and the Commission later determines that the change has a price cap impact, the Postal Service will be forced to either delay the change (and interrupt any operational adjustments already initiated by the Postal Service and mailers) or risk losing scant price cap authority.  To mitigate risk, the Postal Service might need to issue planned rule changes more than several months before filing a price change case, because the proposed rule would make it uncertain how much cap space would remain for the price change.[134]

Alternatively, to avoid such delay, the Postal Service might need to assume that each mail preparation change that could potentially be deemed "significant" under the Commission's standard is subject to the price cap, and either wait to file all such changes in the next general rate case, or file multiple rate cases (for each mail preparation change) throughout the year.[135]  This includes changes for which the Postal

---

[134] Knowing how much cap space is available is a critical factor in the Postal Service's determination of when to initiate a price change, and how to design the specific price changes.

[135] USPS Initial Comments at 11-12.

Service cannot predict mailer costs because, as the Postal Service has pointed out, "the information about whether there would be a price cap impact may not be available until well after the decision to proceed with the mail preparation change needs to be made."[136] The uncertainty generated by the Commission's current standard seriously hurts the Postal Service's operational flexibility. The Postal Service brought these significant concerns to the Commission's attention in its initial and reply comments, yet, as discussed in section IV above, the Commission failed to explain how Order No. 3047 addresses those concerns. The Commission should take the opportunity to do so now.

Finally, the Commission should address the Postal Service's comment that, if mail preparation changes are deemed capable of having rate effects at all, then such changes should also lead to additional cap space in some instances, such as when a significant mail preparation change gives mailers more operational flexibility.[137] The Commission explains "redefinition of a rate cell" only in terms of requirement changes that increase the cost of continuing to qualify for a particular price.[138] If the Commission retains the general approach in Order No. 3047, the Commission should recognize that, by the same logic, a rate cell is also redefined when more mailers are able to qualify for a lower rate as a result of relaxing existing mail preparation rules.

For example, assume that, to receive a particular discount, mailers have to comply with mail preparation Requirement A, which imposes significant compliance costs. If the Postal Service changes its regulations so that mailers no longer need to

---

[136] *Id.* at 12.

[137] *See id.* at 14 ("Presumably, if the Commission uses its framework to determine that such changes have price cap implications, these changes would lead to additional cap space for the Postal Service.").

[138] Order No. 3047 at 17.

- 48 -

comply with Requirement A to access the discount, some mailers who paid the non-discounted rate would now gain access to the lower price because of the relaxed mail preparation requirement.  Assume further that this change in mail preparation requirements would qualify as "significant" under Order No. 3047, because it saves mailers substantial compliance costs.  In that case, it seems only fair that the mailers' move to a lower price category should create additional price cap space for the Postal Service.  Of course, lack of access to mailer cost data poses a problem here as much as when a mail preparation change increases compliance costs, except, in this case, mailers would have an incentive to try to mitigate the cap impact by <u>under</u>estimating their cost savings.  Once again, Order No. 3047 is devoid of any substantive response to these significant comments, which the final rule does not resolve.  If the Commission is determined to keep its standard, it should clarify that the Postal Service is entitled to additional cap space in such circumstances.  If the Commission's position is that mail preparation changes cannot lead to additional cap space, then it should explain why not.

Ultimately, without greater certainty, the Postal Service has no way to know how to apply the significance standard or to assess its practical workability (apart from whether it makes sense as a fundamental policy matter).  In the meantime, the Postal Service is left unable to independently manage its operations or plan its pricing strategy.  Absent reconsideration, "[a]ny meaning that the standard could provide would only come, if at all, after many years of repeated application by the Commission."[139]  Such a

---

[139] USPS Initial Comments at 8-9; *see also id.* at 10 ("With such a general framework, applied on a case-by-case basis, it will be impossible for the Postal Service and mailers to know when operational changes implicate the cap.").

case-by-case approach clearly fails to "resolve[ ] the ambiguity about the treatment under the price cap of future mail preparation requirement changes," as directed by the court, and so it must be reconsidered.[140]

### C.    The First Prong of the Commission's Test Only Increases the Confusion Concerning Which Mail Preparation Changes Would Be Deemed "Changes in Rates."

The ambiguity inherent in the second prong of the Commission's test is not remedied by the test's first prong, under which a mail preparation change is a "change in rates" when it "results in the deletion of a rate cell."[141]  Far from providing clarity or guidance in analyzing whether a mail preparation requirement is subject to the price cap, the first prong appears to overlap (at best) and contradict (at worst) the second prong of the Commission's test.  As such, it only adds to the confusion over which mail preparation changes will be deemed changes in rates.

As an initial matter, it is not at all clear how a change to a mail preparation requirement could ever actually "eliminate" a rate from the MCS.  Mail preparation requirements tell mailers what they must do in order for their mailpieces to qualify for a rate.  If the rate itself is deleted, it no longer has any mail preparation requirements.  To the extent that the first prong merely reminds the Postal Service that it has changed a rate for purposes of 39 U.S.C. § 3622(d)(1)(A) when it eliminates one of the rate cells associated with a given product – for example, by eliminating a previously available discount – then the Postal Service does not disagree that such elimination is a change

---

[140] *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 755 (D.C. Cir. 2015).

[141] Order No. 3047 at 15.

in rates.[142]  An obvious example concerns the Postal Service's decision to eliminate the

three-cent POSTNET discount from various products in the Package Services class.

After eliminating the POSTNET discount for other products in the class beginning in

Docket No. R2012-3, the Postal Service eliminated the discount for Bound Printed

Matter Flats in Docket No. R2013-10 and altered its billing determinants to account for

the effect of that elimination.[143]  The elimination of a discount is not a change to a mail

preparation requirement, however.  Once the POSTNET discount was eliminated, there

were no barcodes that a mailer could utilize (or other mail preparation steps that a

mailer could take) to qualify for the discount.  Instead, the price that a mailer paid for

using the product would rise by three cents.[144]

Even though a mail preparation change cannot itself eliminate a rate, the

Commission's first prong suggests that, even where no rate is literally deleted, a mail

preparation change can cause the "functional elimination of a rate" by making a posted

---

[142] As discussed in section IV.D above, however, the Postal Service maintains that, when it eliminates an entire service or product, it has neither altered a mail preparation requirement nor "deleted" a rate cell for purposes of the Commission's test.  Order No. 3047 does not state otherwise or resolve this important question.

[143] *See* Order No. 1890 at 98 ("The Postal Service proposes to remove a barcode discount previously available for both presorted and non presorted automation compatible BPM Flats. The discounts were available to customers using POSTNET barcodes and were previously eliminated for other Package Services products in Docket No. R2012-3.").

[144] As discussed in footnote 132 above, Order No. 3047 persists in erroneously equating the elimination of the three-cent discount for Bound Printed Matter Flats with the imposition of the Full-Service IMb requirement that triggered the instant proceedings.  The former was a literal rate increase: it eliminated a previously available discount, regardless of any mail preparation steps that a mailer took, and therefore forced mailers to pay higher prices.  The latter, by contrast, is a mail preparation change: it altered what a mailer must do in order to qualify for existing rates, and thus encouraged mailers to change their mail preparation practices so that they could <u>avoid</u> paying higher prices.  Indeed, mailers who changed their mail preparation to comport with the Full-Service IMb requirement would pay lower prices, because they would continue to qualify for automation prices and would also be eligible for the Full-Service IMb discount.

rate "inaccessible" and thereby "effectively rendering the rate obsolete."[145]  This aspect

of the Commission's first prong appears to be tailored specifically to address what it

perceives to be the impact of the Postal Service's Full-Service IMb requirement.  In the

Commission's apparent view, the MCS essentially sets forth two separate automation

rates, a higher rate and a lower rate, for the products at issue.  While both rates would

have continued to exist in the MCS even after implementation of the Full-Service IMb

requirement (that is, no rate would have been literally eliminated), no mailpieces would

actually be entered at the higher of the two rates, and thus that higher rate was

"functional[ly]" deleted.[146]  According to the Commission, this fact alone "fully resolves

the question of the price cap implications of this change."[147]

        This conclusion is confusing, to say the least.  If the Postal Service eliminates the

higher of two rate cells for a product, either by literally deleting it or by rendering it

unavailable, that fact, without more, indicates that the Postal Service has <u>decreased</u> the

rates charged for that product.  However, in the case of the Full-Service IMb

requirement, the Commission has reached the contrary conclusion concerning the effect

on the price cap: that the effective elimination of the higher rate amounts to a rate

increase.[148]  The Commission's conclusion follows from the fact that, under the Postal

Service's proposal, the same mail preparation requirement – the use of Full-Service IMb

– would entitle mailers both to the (higher) standard automation rate and the (lower)

discounted rate, whereas currently a different mail preparation requirement entitles

---

[145] Order No. 3047 at 1-2, 16.

[146] *Id.* at 22.

[147] *Id.*

[148] *Id.* (noting that some mail previously eligible for automation rates would "experience a rate increase").

mailers to enter their mail at the standard automation rate.  Accordingly, the
Commission's analysis depends not on the deletion of a rate cell but on the fact that the
Postal Service has proposed altering a mail preparation requirement for one of the two
rate cells (with the effect that both rate cells would have the same requirements).  The
second prong of the Commission's test already addresses that fact by asking whether
the alteration is "significant" enough to constitute a "redefinition" of the applicable rate
cells.  It is therefore unclear what, if anything, the "functional deletion" aspect of the first
prong adds to the Commission's analysis of whether a mail preparation requirement
amounts to a change in rates or how it is designed to reach conduct that is not already
covered by the second prong.  The impact of any supposedly "effective" deletion of a
rate cell depends entirely on the changes the Postal Service has made to the eligibility
requirements for the rates in question.

At best, therefore, the "functional deletion" inquiry appears unnecessary: it is not
evident how a change to a mail preparation requirement can be tantamount to a rate
increase by meeting the first prong unless it also meets the second prong by forcing
mailers who do not comply with the requirement to pay higher prices.  At worst, the
"functional deletion" inquiry could lead to anomalous results because, unlike the second
prong of the Commission's test, it is not limited by a "significance" standard.  Even when
the Postal Service offers a <u>lower</u> price to mailers in exchange for making minor
adjustments to their mailing practices (thereby satisfying the second prong of the
Commission's test), the first prong suggests that such an action may still somehow be
deemed a rate <u>increase</u> if the Postal Service simultaneously eliminates the <u>higher</u> price
that mailers previously paid.

To illustrate the anomaly that the Commission's first prong could produce, suppose that the Postal Service invests in new mail processing equipment that will result in increased efficiency but would require mailers to slightly alter the placement of their address labels.  To encourage mailers to make the mail preparation change, the Postal Service could simply require mailers to alter their address placement in order to continue receiving automation rates.  Alternatively, it could first provide a discount to mailers that make the change voluntarily; then, after a year, it could mandate that the change be made (but with the mandated mailers receiving the benefit of the discounted rate).

It would seem obvious that mailers would pay lower prices under the second approach: both approaches would ultimately require mailers to alter their address placement, but the second approach would give mailers discounted rates when they did so.  However, the Commission's test could result in the second approach (but not the first) being deemed a rate increase.  The first approach (simply mandating compliance) would be governed by the second prong of the Commission's test, where the question would be whether the mail preparation change is "significant" enough to be deemed a "redefinition" of the rate cell (and thus a change in rates) and where the answer would certainly be that the change is too minor to be deemed "significant."  By contrast, the second approach (offering a discounted rate, and then later mandating compliance and effectively eliminating the non-discounted rate) would implicate the first prong, which is not subject to a "significance" limitation.  The Commission would apparently conclude that the Postal Service has <u>raised</u> rates once it eliminated the non-discounted automation rate.  This makes no sense at all.  Not only do both approaches require

mailers to face the same choice – change their mailing practices or cease qualifying for automation rates – the rates that newly compliant mailers actually pay would be lower under the second approach than they would under the first approach.

Because the relationship between the "functional deletion" inquiry and the Commission's second prong is needlessly unclear and confusing, the Commission must reexamine the "functional deletion" inquiry and eliminate it.

### D.    The Commission Improperly Assumes That No Mailers Will Adapt.

The Commission's approach is particularly unreasonable because the assumption that no mailers will adapt to a mail preparation requirement change makes it economically irrational for the Postal Service to adopt efficiency-enhancing requirement changes.[149]  The Commission's approach overstates the price cap impact of such changes by assuming that no mailers will adapt and thereby avoid the higher rates.  As a consequence, the Postal Service must give up revenue in order to implement efficiency-enhancing mail preparation changes.

Indeed, the Commission's approach consumes cap space disproportionately to the impact of an equivalent direct price increase.  Under the latter, the Postal Service will generate real revenue from mailers paying the higher prices.  Under the former, however, the Postal Service does not earn any additional revenue for mailers that actually adapt to a mail preparation change, even though the cap calculation assumes that it will.  The Postal Service is thus left with little or no cap space to raise prices, and little to no offsetting revenue from the mail preparation change.

---

[149] The Postal Service raised this concern in its reply comments, but the Commission did not address it in Order No. 3047.  *See* USPS Reply Comments at 17-18.

The case of Full-Service IMb is a particularly apt example. Even without an IMb requirement, mailers have been adopting Full-Service IMb in the two years since the Postal Service was forced to defer the IMb requirement. As of December 2015, over 88 percent of eligible mail volume had voluntarily shifted to Full-Service, compared to the 64 percent compliance rate available during Docket No. R2013-10.[150] This increase demonstrates that the related costs are not exceptionally high, at least not when appropriately weighed against lower rates, increased visibility into the mailstream, and other benefits. These objective, historical data on mailer adoption rates show that the overwhelming majority of mailers have shifted to Full-Service IMb even though they did not face the prospect of paying a higher rate if they declined to do so. In light of this, it is unreasonable to assume that the remaining 12 percent of mailers faced with the choice of updating their barcodes or sending their mail at a higher rate would not likewise adopt Full-Service IMb.

Moreover, the actual voluntary adoption rates since Order No. 1890 show that the Commission's price cap calculation in that order[151] overstated the size of the price reduction that would have been required to implement the requirement while staying within the price cap.[152] As a result, the Postal Service would have lost hundreds of millions of dollars per year in revenue that the Commission assumed it would have received from mailers paying the higher non-Full-Service rates. In Docket No. R2013-

---

[150] These figures derive from the Postal Service's PostalOne! data system.

[151] Order No. 1890 at 2.

[152] In its reply comments, the Postal Service noted the increased adoption rate since Docket No. R2013-10 and the fact that, had the Postal Service gone forward with the IMb requirement, it would have been overcharged cap space. USPS Reply Comments at 17-18, n.38. This issue is entirely ignored in Order No. 3047.

10, the Commission used Full-Service adoption rates as of July-September 2013 to calculate the cap impact of implementing the planned rate changes simultaneously with the Full-Service IMb requirement.[153]  The Commission's calculations assume that mailers who had not voluntarily adopted Full-Service by that time would pay higher, non-automation rates.  The Commission determined that the total cap impact based on these adoption rates would have been 4.118 percent for First-Class Mail, 4.900 percent for Standard Mail, and 3.069 percent for Periodicals.[154]  Since the available price cap was only 1.696 percent, the Postal Service would have had to substantially lower prices in order to stay under the cap, in order to implement the Full-Service IMb requirement.  Faced with this option, the Postal Service ultimately elected not to implement the requirement contemporaneously with the proposed rates.[155]

By February 2014, however, immediately after the Full-Service requirement would have gone into effect, the actual Full-Service adoption rates had significantly surpassed the numbers that the Commission used to calculate the cap impact in Docket No. R2013-10, even though the Full-Service requirement had not been imposed.  The table below shows the actual percentage of Full-Service-eligible mail that was not using

---

[153] Compliance Calculations for First-Class Mail, Excel file "CAPCALC-FCM-R2013-10 IMb PRC.xls," tab "Calc of Non-IMb Pieces," PRC-LR-R2013-10/1, PRC Docket No. R2013-10 (Nov. 21, 2013); Compliance Calculations for Standard Mail, Excel file "PRC CAP-CALC-STD-R2013-10_IMB.xls," tab "IMB," PRC-LR-R2013-10/2, PRC Docket No. R2013-10 (Nov. 21, 2013); Compliance Calculations for Periodicals, Excel file "PRC CAP-CALC-PER-R2013-10_IMB.xls," tabs "Outside County" and "Within County," PRC-LR-R2013-10/3, PRC Docket No. R2013-10 (Nov. 21, 2013); *see also* Response of the United States Postal Service to Chairman's Information Request No. 3, Questions 1-2, and 6-7, PRC Docket No. R2013-10 (Oct. 24, 2013), Excel file "ChIR3.Qu2.Response.IMbAdoption.xlsx."

[154] Order No. 1890 at 2.

[155] Response of the United States Postal Service to Order No. 1890, PRC Docket No. R2013-10 (Nov. 29, 2012), at 2.

Full-Service IMb as of February 2014, compared with the percentages used in Docket

No. R2013-10.

|  | Percent of Eligible Volume Not Already Using Full-Service IMb, per Docket No. R2013-10 | Percent of Eligible Volume Not Already Using Full-Service IMb, as of February 2014[156] |
|---|---|---|
| FCM Letters & Cards | 27% | 19% |
| FCM Flats | 81% | 57% |
| Standard Mail Letters | 42% | 31% |
| Standard Mail Flats | 45% | 23% |
| Periodicals Letters | 84% | 78% |
| Periodicals Flats | 34% | 26% |

Thus, the actual volume of mail that would have been charged the higher, non-

automation prices at implementation was substantially lower than assumed by the

Commission's price cap analysis. Had the Postal Service decided to go forward with

the Full-Service requirement as planned, it would not have received the revenue that

the Commission assumed would have been generated by noncompliant mailers.

Replacing the July-September 2013 adoption rates with the actual data for February

2014, the Postal Service estimates that the Full-Service IMb requirement in conjunction

with the rates planned in Docket No. R2013-10 would have had a cap impact of only

3.374 percent for First-Class Mail, 3.919 percent for Standard Mail, and 2.779 percent

for Periodicals.[157]

---

[156] The figures in this column derive from the Postal Service's PostalOne! data system.

[157] To calculate these results, the Postal Service updated the Commission's workpapers calculating the price cap impact of implementing the Full-Service IMb requirement simultaneously with the planned rates in Docket No. R2013-10, using the actual data for February 2014 as reflected in the PostalOne! database, instead of  the data from the three-month period between July and September 2013. This analysis is comparable to the Appendix A analyses that the Commission has included in most of its Annual Compliance Determinations (ACDs), such as those for FY2009 through FY2012. In those analyses, the Commission calculated the percentage increase in price by class using the volumes for the first year in which the prices had actually been in effect, and compared the results to the percentage price increase

Comparing these results with the cap impact the Postal Service would have had to accept pursuant to Order No. 1890, the Postal Service would have given up 0.744 percent in uncompensated cap space for First-Class Mail,[158] 0.981 percent in uncompensated cap space for Standard Mail,[159] and 0.290 percent in uncompensated cap space for Periodicals.[160]  This translates into nearly $373 million in lost revenue per year because of the Commission's assumption that mailers would not adapt to the rule change.[161]  Indeed, these estimates are conservative, because the Full-Service IMb requirement has not been imposed.  It is reasonable to assume that even more, if not nearly all, mailers would have adopted Full-Service if it had become a requirement.

In fact, the actual Full-Service adoption rates as of December 2015 show the absurdity of the Commission's assumption that no mailers would adapt to the Full-Service IMb rule change.  The table below shows the actual percentage of Full-Service-

---

calculated using the historical billing determinants available during the Commission docket that approved the prices.  The FY 2013 ACD included an Appendix A, but did not complete the post-implementation analysis because the previous rate case included major classification changes for which the post-implementation data were not available in adequate detail.  Annual Compliance Determination Report, Fiscal Year 2013, PRC Docket No. ACR2013 (Mar. 27, 2014), at 133-34.  Fortunately, adequate data are available for post-implementation review of the Full-Service IMb change.

[158] 4.118 percent minus 3.374 percent.

[159] 4.900 percent minus 3.919 percent.

[160] 3.059 percent minus 2.779 percent.

[161] To calculate revenue lost per year, the Postal Service first determined, for each affected class, the percent price decrease that would have been required to implement the Full-Service IMb requirement simultaneously with the planned rate adjustments by subtracting the available cap space in Docket No. R2013-10 from the percent rate increase as determined by the Commission in Order No. 1890.  Next, the Postal Service calculated the revenue reduction that would have been attributable to this price decrease (Order No. 1890 Revenue Reduction) by multiplying the percent price decrease by the total before-rates postage for the class.  These steps were repeated to determine the percent price decrease that would have been required to implement the Full-Service requirement based on the actual adoption rates as of February 2014, and the resulting reduction in revenue (February 2014 Revenue Reduction).  Finally, the Postal Service calculated the revenue lost per year by subtracting the February 2014 Revenue Reduction from the Order No. 1890 Revenue Reduction.  The Postal Service determined that the revenue lost per year totaled roughly $221 million for First-Class Mail, $147 million for Standard Mail, and $5 million for Periodicals.

eligible mail that was not using Full-Service IMb as of December 2015, compared with

the percentages used in Docket No. R2013-10.

| | Percent of Eligible Volume Not Already Using Full-Service IMb, per Docket No. R2013-10 | Percent of Eligible Volume Not Already Using Full-Service IMb, as of December 2015[162] |
|---|---|---|
| FCM Letters & Cards | 27% | 9% |
| FCM Flats | 81% | 26% |
| Standard Mail Letters | 42% | 12% |
| Standard Mail Flats | 45% | 17% |
| Periodicals Letters | 84% | 51% |
| Periodicals Flats | 34% | 17% |

The actual volume of mail that would have been charged non-automation prices by the

end of calendar year 2015 was so much lower than assumed by the Commission's price

cap analysis in Docket No. R2013-10 that the gravity of the impact on the Postal

Service's finances is patent.  Using the actual Full-Service adoption data for December

2015, the Postal Service estimates that the Full-Service IMb requirement, in conjunction

with the rates planned in Docket No. R2013-10, would have had a cap impact of only

2.443 percent for First-Class Mail, 2.596 percent for Standard Mail, and 2.393 percent

for Periodicals.[163]

Comparing these results with the cap impact the Postal Service would have had

to accept pursuant to Order No. 1890, the Postal Service would have given up 1.675

percent in uncompensated cap space for First-Class Mail,[164] 2.304 percent in

uncompensated cap space for Standard Mail,[165] and 0.676 percent in uncompensated

---

[162] The figures in this column derive from the Postal Service's PostalOne! data system.

[163] See the updated price cap analysis at footnote 157 above.

[164] 4.118 percent minus 2.443 percent.

[165] 4.9 percent minus 2.596 percent.

cap space for Periodicals.[166]  This translates into nearly $855 million in lost revenue per

year because of the Commission's assumption that mailers would not adapt to the rule

change.[167]  Again, these estimates are conservative, as the adoption rates observed as

of December 2015 were the result of voluntary compliance.

      Again, given that over 88 percent of eligible mail volume has already voluntarily

shifted to Full-Service IMb, it is entirely reasonable to assume that, if the Postal Service

had made Full-Service a requirement as planned, mailers would have shifted virtually all

of their eligible mail volume to Full-Service in order to avoid paying non-automation

rates.  Thus, a more telling analysis assumes that the Postal Service would have

achieved 100 percent adoption.[168]  Under that scenario, the Full-Service IMb

requirement should have had no impact on the price cap, because the Postal Service

would not have seen increased revenue for <u>any</u> of the Full-Service eligible mailpieces

that the Commission assumed would have paid the non-automation rates.  The

Commission's use of July-September 2013 data would have amounted to a staggering

---

[166] 3.069 percent minus 2.393 percent.

[167] See the analysis of revenue lost per year at footnote 161 above.  The Postal Service determined that the revenue lost per year totaled roughly $497 million for First-Class Mail, $346 million for Standard Mail, and $11 million for Periodicals.  This analysis assumes that these non-adoption rates would be reached by the time the Full-Service IMb requirement was implemented.  Even if they were not reached until a year after implementation of the requirement, most of the revenue would still be lost.  The Commission's cap approach assumes that the Postal Service would receive revenue from the higher rates forever, when, in fact, the Postal Service would stop receiving the revenue as soon as the mailers comply and become eligible for the lower rate.  Thus, the price cap is an inappropriate tool to use to regulate the Postal Service's mail preparation changes.

[168] The historical voluntary adoption rates strongly indicate that compliance rates in response to a Full-Service requirement would be higher than 90 percent.  Assuming 100 percent compliance for purposes of this illustration is a reasonable way to demonstrate the magnitude of potential harm resulting from the Commission's standard.

revenue loss of nearly $1.223 billion per year.[169]  A revenue loss of this magnitude (or

of the magnitude using the February 2014 and December 2015 data) is a clear threat to

the Postal Service's financial stability, notwithstanding statutory objective 5.  Because

Order No. 3047 does not address these dire implications, the Commission should take

this opportunity to reconsider its decision.

To be clear, the point of this analysis is to illustrate a serious flaw in the

assumptions underlying the Commission's standard and its analysis of the erstwhile

Full-Service IMb requirement change.  The Postal Service is not suggesting that the

flaw can be cured by periodic "look-back" reviews and corrections of available price cap

authority.  The Postal Service has already pointed out why such measures have their

own flaws and are inconsistent with Commission precedent,[170] and the Commission

was right to reject them.[171]  Nevertheless, the Commission's assumption that all eligible

mailers would rather default into a higher rate cell than adopt Full-Service IMb cannot

be squared with real-world experience and does not demonstrate reasoned decision-

making.  Moreover, the assumption makes it economically irrational for the Postal

Service to go forward with any mail preparation requirement for which the Commission

would impose a price cap impact, because the Commission's approach to mail

preparation requirements would consume cap space so disproportionately to the impact

of an equivalent direct price increase.  As such, the Commission should either

---

[169] The Postal Service determined that the revenue reduction figures from Order No. 1890 totaled roughly $718 million for First-Class Mail, $482 million for Standard Mail, and $23 million for Periodicals.  See the analysis of revenue lost per year at footnote 161 above.

[170] USPS Reply Comments at 33-38.

[171] Order No. 3047 at 52.

- 62 -

reconsider how its standard would apply to the Full-Service IMb requirement change, or else reconsider the rationality of the standard itself.

## VI.    CONCLUSION

In light of the court's directives, the statutory objectives and factors, the Administrative Procedure Act, the Commission's representations to the Postal Service and the court, and the internal inconsistency and practical implications of the Commission's standard, Order No. 3047 must be reconsidered.

Exhibit B

Postal Regulatory Commission
Submitted 2/23/2016 3:47:58 PM
Filing ID: 95080
Accepted 2/23/2016

ORDER NO. 3095

UNITED STATES OF AMERICA
POSTAL REGULATORY COMMISSION
WASHINGTON, DC 20268-0001

Before Commissioners:                          Robert G. Taub, Acting Chairman;
                                               Nanci E. Langley, Vice Chairman;
                                               Mark Acton; and
                                               Tony Hammond

Notice of Market-Dominant                                    Docket No. R2013-10R
Price Adjustment

ORDER EXTENDING TIME TO RESPOND
TO MOTION FOR RECONSIDERATION

(Issued February 23, 2016)

On February 22, 2016, the Postal Service filed a motion for reconsideration of Order No. 3047.[1] The Postal Service simultaneously filed a motion to suspend the related rulemaking proceeding pending resolution of the Motion for Reconsideration.[2]

Given the scope of issues raised by the Postal Service's Motion for Reconsideration and the demands on all parties' resources in active Commission proceedings, the Commission will extend the time for interested parties to respond to the Postal Service's Motion for Reconsideration. Interested persons may file responses to the Motion for Reconsideration no later than April 11, 2016. Responses shall be

---

[1] Motion for Reconsideration of Order No. 3047, February 22, 2016 (Motion for Reconsideration).

[2] Docket No. RM2016-6, Motion of the United States Postal Service to Suspend Proceedings, February 22, 2016.

Docket No. R2013-10R                    - 2 -

limited to responding to the issues raised by the Postal Service in its Motion for Reconsideration.

*It is ordered*:

1.     Interested persons may file responses to the Motion for Reconsideration of Order No. 3047 no later than April 11, 2016.

2.     Responses to the Motion for Reconsideration shall be limited to the issues raised by the Postal Service.

By the Commission.


                                        Stacy L. Ruble
                                        Secretary

## CERTIFICATE OF COUNSEL
## AS TO PARTIES, RULINGS, AND RELATED CASES

**A. Parties and Amici.**

The petitioner in this Court is the United States Postal Service. The respondent in this Court is the Postal Regulatory Commission. The National Postal Policy Council has moved for leave to intervene in this Court. The Alliance of Nonprofit Mailers, American Catalog Mailers Association, Association for Postal Commerce, Direct Marketing Association, MPA - The Association of Magazine Media, National Postal Policy Council, Valpak Dealers' Association, and Valpak Direct Marketing Systems intervened in the prior proceeding in this Court.

**B. Rulings Under Review.**

Petitioner seeks review of Order No. 3047 of the Postal Regulatory Commission issued in Docket No. R2013-10R.

**C. Related Cases.**

This case was previously before this Court in *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 756 (D.C. Cir. 2015). Counsel for the Commission are not aware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Respectfully submitted,

/s/ Dana Kaersvang
Dana Kaersvang
Counsel for Respondent

## CERTIFICATE OF SERVICE

I hereby certify that on March 21st, 2016, I electronically filed the foregoing motion with the Clerk of Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system.  All participants in this case are registered CM/ECF users, and will be served by the Notice of Docket Activity generated by the CM/ECF system.

/s/ Dana Kaersvang
Dana Kaersvang
Counsel for Respondent